**UNITED STATES of America, Appellee,**

v.

**Ralph SCOPO and Dominic Montemarano, Defendants–Appellants.**

Nos. 1020, 1041, Dockets 87–1469, 87–1470.

United States Court of Appeals, Second Circuit.

Argued May 2, 1988.

Decided Oct. 28, 1988.

---

340

Celia Goldwag Barenholtz, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty. for S.D. of New York, Peter M. Lieb, Aaron R. Marcu, Asst. U.S. Attys., New York City, on the brief), for appellee.

Judd Burstein, New York City, for defendant-appellant Scopo.

Harold J. Boreanaz, Buffalo, N.Y. (John F. Humann, Patrick J. Baker, Boreanaz, Baker & Humann, Buffalo, N.Y., on the brief), for defendant-appellant Montemarano.

Before OAKES, KEARSE, and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Ralph Scopo and Dominic Montemarano appeal from judgments entered in the United States District Court for the Southern District of New York following a jury trial before John F. Keenan, *Judge*, convicting both defendants on one count of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. § 1962(d) (1982) (count 1); one count of participating in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) (1982) (count 2); one count of conspiring to extort money, in violation of the Hobbs Act, 18 U.S.C. § 1951 (1982) (count 3); and eight substantive Hobbs Act counts of extortion, in violation of 18 U.S.C. §§ 1951 and 2 (1982) (counts 4–11); and convicting Montemarano on one count of soliciting a bribe and aiding and abetting a labor official in receipt of a bribe, in violation of the Taft-Hartley Act, 29 U.S.C. § 186(b)(1) (1982), and 18 U.S.C. § 2 (count 12); and one count of bribing a public official, in violation of 18 U.S.C. § 201(b)(3) (1982) (count 13). Scopo was sentenced to concurrent prison terms of 10 years each on counts 1 and 2; to a two-year prison term on count 3, to be served consecutively to the 10-year term on count 1; to consecutive one-year prison terms on counts 4, 5, and 6, to be served consecutively to the term on count 3; and to concurrent one-year prison terms on counts 7–11, to be served concurrently with the terms imposed on the other counts. Scopo's sentence was to be served concurrently with a 100–year sentence imposed on him in another case, *United States v. Salerno*, No. SSS 85 Cr. 139 (S.D.N.Y. Jan. 13, 1987) ("*Salerno I*" or "Commission Case").

Montemarano was sentenced to concurrent prison terms of 15 years each on counts 1 and 2; to a one-year prison term on count 3, to be served consecutively to the 15–year terms on counts 1 and 2; to consecutive one-year prison terms on counts 12 and 13, to be served consecutively to the term on count 3; and to concurrent one-year prison terms on counts 4–11, to be served concurrently with the terms imposed on the other counts.

On appeal, Scopo contends principally that his rights under the Sixth Amendment to the Constitution were infringed by the trial court's refusal to allow him to be represented by counsel of his choice and its refusal to authorize the issuance of subpoenas to permit him to call certain witnesses. Montemarano principally challenges the trial court's admission into evidence of certain tape recordings and other evidence. For the reasons below, we affirm the judgments of conviction.

## I. BACKGROUND

In October 1984, Scopo and Montemarano were indicted, with others, on various charges arising out of activities of the Colombo organized crime family of La Cosa Nostra ("Colombo family"). Prior to or during a trial of most of the defendants under a 51–count superseding indictment, *see United States v. Persico*, 832 F.2d 705 (2d Cir.1987) (affirming convictions of eight codefendants found guilty at that trial ("*Persico* trial")), *cert. denied*, —— U.S. ——, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988), several of the defendants, including Scopo and Montemarano, were granted severances for health reasons. At the later trial of Scopo and Montemarano, which resulted in the convictions at issue on the present appeal, the government voluntarily dismissed several counts, and the indictment was redacted and renumbered into 13 counts. Our references are to the indictment as renumbered.

The trial centered principally on allegations that from at least 1981 through the date of the indictment, the Colombo family, by means of its control of various labor unions, had engaged in a scheme of extort-

ing moneys from New York City area construction companies in connection with concrete-pouring contracts having a value of $2 million or less. The government's evidence was presented principally through (a) tape recordings of conversations resulting from extensive court-ordered wiretapping, electronic surveillance, and undercover investigations, and (b) testimony of associates and victims of the Colombo family. Since there is no substantial challenge to the sufficiency of the evidence to support the convictions, we summarize but briefly the proof at trial, taken in the light most favorable to the government.

The Colombo family, headed by codefendant Carmine Persico, operated through entities known as "crews." Each crew consisted of a "capo" or leader, "soldiers" who had been made members of the family, and a number of non-family-member "associates." Montemarano was a capo in the Colombo organization. Scopo was a soldier in the family and was president of the District Council of Cement and Concrete Workers Unions, an alliance of labor unions that represented New York City's concrete workers. At the instruction of Montemarano and other leaders in the Colombo family, Scopo used this position to influence and control the decisions of certain individual unions in the construction industry; he used his control of the unions to extort payments from construction companies in exchange for guaranteeing labor peace and allowing the companies to use workers not affiliated with his unions. A portion of the money extorted was kept by Scopo and the remainder was paid to other members of the Colombo family. A series of witnesses testified to acts of extortion by Scopo, and there was evidence that during the period in question, virtually all concrete-pouring contracts in Manhattan having a value of $2 million or less were controlled in this way.

As to Manhattan projects whose concrete contracts had a value of more than $2 million, which were a subject of *Salerno I* rather than the present case, there was evidence that the Colombo family coordinated with three other organized crime families in New York City to control bid-ding and awards. These families organized a "Club" of six contractors, rigged bids on these larger contracts, and prevented awards to any firm outside the Club. Club members paid Scopo two percent of the contract price, which was then divided among the four organized crime families.

The trial record also included evidence that in 1981, at a time when Persico was incarcerated, Montemarano sought to bribe a prison official to arrange the transfer of Persico to a different prison.

The jury found Scopo guilty on all 11 counts in which he was named, *i.e.*, those charging RICO and Hobbs Act conspiracies, one substantive RICO violation, and eight substantive Hobbs Act acts of extortion. Montemarano was found guilty on these 11 counts and on one count of bribery of a union official and one count of bribery of a public official. Each defendant was sentenced as indicated above.

## II. DISCUSSION

On appeal, Scopo contends principally that his Sixth Amendment rights were violated by the court's refusal to permit him to be represented by counsel of his choice and by its refusal to permit him to subpoena a number of contractors to testify in his behalf at trial. In addition, both defendants contend (1) that the court should have excluded from evidence certain tape recordings on the ground that the tapes lacked the seal required by the federal wiretapping statute, and (2) that they were denied a fair trial because of (a) prejudicial publicity that came to the jury's attention during trial, and (b) the court's unrelated excusing and nonreplacement of one juror during the jury's deliberations. Montemarano also challenges certain of the court's evidentiary rulings. We have considered these and all other arguments made by defendants on appeal and find them to be without merit.

### A. *Scopo's Right to Counsel*

At trial, Scopo appeared *pro se*, assisted by counsel appointed for him by the court, because his preferred attorney was unavailable. Scopo contends that the

court's refusal to grant him a continuance of the trial date so that he could be represented by counsel of his choice deprived him of his rights under the Sixth Amendment. Given the sequence of events described below, we disagree.

The original *Persico* trial began in October 1985 and lasted some eight months. Seven weeks into that trial, Scopo was granted a severance for reasons related to his health. In 1986, Scopo went to trial in *Salerno I;* convicted in that case, he was sentenced on January 13, 1987, to a 100-year term in prison. On January 21, 1987, Judge Keenan held a scheduling conference in the present case and entered an order scheduling the trial of Scopo and Montemarano to begin on May 4, 1987.

At the original trial, Scopo had been represented by Barry Slotnick, Esq. An associate of Slotnick attended the January 21 conference and unsuccessfully opposed the May 4 trial date, advising the court that, because of existing trial commitments, Slotnick would not be available in the present case until "June at the very earliest." In light of this representation, the court scheduled another conference for February 6 to explore the matter of who would represent Scopo at trial.

At the February 6 conference, Slotnick revealed that he had other trial commitments that would keep him occupied past June and probably through August. He urged the court to postpone trial of Scopo until the conclusion of the appeals in *Salerno I*, reasoning that if Scopo's 100-year sentence were affirmed, a plea agreement could be reached and a trial would be unnecessary. The court rejected this argument, noting the likelihood that the appeals in *Salerno I* would not be decided before sometime in 1988, the need to try Montemarano in any event, and the nearly complete overlap between the charges against Montemarano and Scopo; in addition, a third severed defendant might also eventually be tried. Considerations of judicial efficiency thus suggested that Montemarano and Scopo be tried together in order to minimize the number of times the court or the government would be required to conduct lengthy trials on the same charges. Accordingly, the court refused to alter the May 4 trial date. It stated that it would relieve Slotnick as counsel and instructed him to return for a conference on February 20 to report on Scopo's progress in obtaining new counsel.

On February 20, Slotnick did not appear because he was ill. Slotnick's associate reaffirmed that Slotnick's trial schedule was as it had been represented at the February 6 conference. The court stated that the May 4 trial date was firm, reiterated that Scopo should obtain another attorney, and scheduled another conference for February 27.

At the February 27 conference, Slotnick informed the court that Scopo had attempted to retain for the May 4 trial the attorney who had represented him in *Salerno I*, but that that attorney was unavailable. Slotnick again urged that trial be postponed until September, but he conceded that it was a realistic possibility that he would not be available for trial until November or December. The court denied the request and scheduled another conference, ordering that Scopo be brought to attend in person.

At a March 12 conference, Scopo appeared and stated that he had contacted two other attorneys but that they were otherwise occupied. He urged the court to delay the trial until Slotnick could represent him. The court denied the request. Noting that from January 21 on, it had repeatedly directed that if Slotnick could not be available in May Scopo was to obtain other counsel, the court again directed Scopo to obtain another attorney and stated that if he did not, he would be required to go to trial without an attorney. The court scheduled another conference for March 20.

Further conferences were held on March 20, March 27, March 30, and April 3. Scopo reported that he had not retained new counsel and that he wanted Slotnick to represent him. At each conference, the court advised Scopo that if he did not obtain new counsel, he would be required to proceed *pro se.* On March 30, Scopo filed a formal motion for a continuance of the May

4 trial date. The court denied the motion in a Memorandum Opinion and Order dated April 7, 1987, summarizing the events since January 21, and noting that Slotnick had been unable to guarantee that he would be available for the present trial even as early as September, that the court had repeatedly ordered Scopo to retain new counsel, that Scopo's efforts in that regard had been half-hearted, and that the time afforded Scopo to obtain new counsel had been more than reasonable. The court concluded that, in all the circumstances, the orderly administration of justice required that the trial proceed as scheduled.

Another conference was held on April 13. Scopo reported that he had not obtained a new attorney and that Slotnick was his attorney of choice. The court stated that it would appoint a stand-by attorney to assist Scopo at trial.

Over Scopo's objection, the court appointed stand-by trial counsel for Scopo on April 22. That attorney, Austin Campriello, Esq., assisted Scopo throughout the trial. Scopo allowed him to make the opening statement and summation on Scopo's behalf, to make motions, to object to evidence, and to cross-examine the government's witnesses.

The Sixth Amendment gives a defendant in a criminal proceeding the right to "the Assistance of Counsel for his defence." Recognition of this right requires that "a defendant ... be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932). Nonetheless, the "right to choose one's own counsel is circumscribed in several important respects," *Wheat v. United States*, —— U.S. ——, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988), and "must at times give way to the need for the fair and efficient administration of justice," *United States v. Cicale*, 691 F.2d 95, 106 (2d Cir.1982), *cert. denied*, 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983).

The matter of whether or not to adjourn a trial date "is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964); *see Avery v. Alabama*, 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377 (1940). Thus, " 'where the inability of retained counsel to serve gives promise of unreasonable delay or inconvenience in completing the trial, the court may require the defendant to secure other counsel.' " *United States v. Cicale*, 691 F.2d at 106 (quoting *United States v. Bentvena*, 319 F.2d 916, 936 (2d Cir.), *cert. denied*, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963)). "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 1616–1617, 75 L.Ed.2d 610 (1983) (quoting *Ungar v. Sarafite*, 376 U.S. at 589, 84 S.Ct. at 849).

We see no abuse of discretion in the court's insistence on the May 4, 1987 date. The date was set three and one-half months in advance; though repeated requests were made for an adjournment until September, there was no guarantee, as Slotnick conceded, that Slotnick would be available in September. The case had been pending more than two years, Montemarano was awaiting trial, and it made little sense to try him and Scopo separately in light of the overlapping charges. Scopo was forewarned in January 1987 that Slotnick could not represent him at trial in May, and from that time on, the court repeatedly made it clear that it would not adjourn the May 4 date and ordered Scopo to find new counsel. Plainly, Scopo was given ample opportunity to select another attorney to represent him at trial, and the denial of an adjournment did not violate his Sixth Amendment rights.

B. *The Denial of Scopo's Request for Subpoenas*

During the trial, Scopo sought to call as witnesses 13 persons involved in the construction industry (the "industry witnesses") to testify principally that there was no

bidrigging in concrete-pouring contracts above the $2 million level and that Scopo had never extorted money from them. The court denied the subpoenas on the ground that the proposed testimony would be merely collateral to the issues in the case. The charges here focused solely on concrete-pouring contracts worth $2 million or less. A bill of particulars furnished by the government explicitly so stated, and all of the counts against Scopo alleged extortionate schemes or acts with respect to contracts at this level. Though the government believed the scheme alleged here was complementary to the scheme in which four organized crime families in New York City controlled the award of Manhattan concrete contracts worth more than $2 million, charges relating to the latter scheme were included in the *Salerno I* indictment and excluded from this case. Hence, the court concluded that the testimony to be elicited from Scopo's proposed industry witnesses would not address any of the charges in the present indictment, and it refused to issue the subpoenas.

Scopo points out that the government's proof at trial, both the live testimony and the tapes of conversations to which Scopo was a party, included statements by Scopo with respect to concrete-pouring contracts worth more than $2 million, and he contends that the court's refusal to subpoena his industry witnesses infringed his Sixth Amendment right to rebut the government's proof. We disagree.

The Sixth Amendment, by its terms, gives the defendant in a criminal trial the right "to have compulsory process for obtaining witnesses in his favor." This does not, however, guarantee him an unrestricted right to compel the presence of any and all witnesses he may choose. Rather, the defendant who complains that his right to call witnesses has been violated "must at least make some plausible showing of how their testimony would have been both material and favorable to his defense." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982); *see id.* n. 7; *United States v. Ginsberg*, 758 F.2d 823, 831 (2d Cir.1985); *United States v. Taylor*, 562 F.2d 1345,

1362 (2d Cir.), *cert. denied*, 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977).

In assessing the value of proposed witnesses' testimony, we must bear in mind that the trial judge has wide discretion to exclude proffered evidence that is collateral, rather than material, to the issues in the case. *E.g.*, *United States v. Gleason*, 616 F.2d 2, 21–23 (2d Cir.1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 & 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980); *cf.* Fed.R.Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed ... by considerations of undue delay [or] waste of time...."). If the court could properly have excluded proffered testimony on the ground that the evidence was collateral, its refusal to subpoena witnesses who were to give that testimony cannot be deemed error.

The principal witness who referred to the contracts worth more than $2 million was Stanley Sternchos, who testified that his company, Technical Concrete Construction Corporation ("Technical"), had been forced to pay Scopo sums totaling between $800,000 and $900,000 from 1981 to 1984. Sternchos's testimony with respect to conversations with Scopo included the following.

Scopo told a Technical partner in 1980 that Technical would have to pay Scopo one percent of each contract it was awarded if it wanted to do business in New York City. A portion of this money would be passed on to Scopo's crime family. When Technical thereafter tried to bid on contracts worth more than $2 million, Scopo told Sternchos that was impermissible because such projects were allocated among six firms, which he named, each of which was controlled by one of four organized crime families. Scopo referred to these firms as the "Club." He described for Sternchos an incident in which a Club member had failed to pay the required percentage to the four families and stated that only the fact that the company was going out of business prevented its principal from being killed. Although Scopo never directly threatened

him, Sternchos testified that Scopo's mention of this incident "certainly pointed out to [Sternchos] that Ralph Scopo felt that he and his people had the power to kill anybody whenever they felt like it," and Sternchos feared for his own physical safety and that of his family if Technical did not pay Scopo.

The evidence of Scopo's statements with respect to the prevalence of payoffs in the construction industry and with respect to control of the award of contracts worth more than $2 million was relevant to the present case in two respects. First, many of these statements were intertwined with Scopo's extortion of moneys on contracts worth less than $2 million and were needed as background to clarify Scopo's demands of companies such as Technical. Second, an element of the nine Hobbs Act counts (which in turn were charged as RICO predicate acts) was the extortion of money through the "wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2). Scopo's statements to Sternchos as to the sole reason the four crime families had decided not to kill a man who failed to make a required Club payment plainly provided a sound basis for Sternchos to fear violence should Technical discontinue paying Scopo.

Both of these uses of the over-$2 million evidence served to underscore the collateral nature of the rebuttal proposed by Scopo. His proposed industry witnesses included five officials of four of the firms that Sternchos said Scopo had identified as members of the Club. Scopo informed the court that he expected these five to testify that he had never extorted money from them or that as far as they knew there was no Club. Five other proposed witnesses were to testify that although their firms were not alleged to be members of the Club, they had obtained contracts worth more than $2 million. Two others were to testify that their company had 60% of the concrete business in the metropolitan area, that as far as they knew there was no Club, and that Scopo had never tried to shake them down. The last proposed witness, a subcontractor, was to testify that Technical had never asked it to inflate its

bid, as Technical might have done in order to provide funds for a payoff to Scopo.

Thus, the thrust of the testimony of Scopo's proposed witnesses would have been that in fact there was no Club, no rigging of bids above the $2 million level, and no payoffs above that level. The government's use, however, of Scopo's statements as to the existence of the Club and the extreme penalty for nonpayment to the crime families did not depend on the truth of those statements. Scopo used his statements to control the actions of the firms from which he extorted money and to instill fear of violence in his extortion victims. Thus, for the present case, the important fact regarding the Club was not whether or not it actually existed or how it worked but only whether Scopo made the statements. Even if Scopo's proposed witnesses could have cast doubts on the veracity of Scopo's statements, they could not have cast doubt that the statements were made.

In sum, the trial court's view that the proposed testimony of Scopo's industry witnesses was directed to a collateral matter was entirely sound. None of the proposed testimony would have contradicted the charges in the present indictment; it would not have dealt with contracts of $2 million or less; and it would not have addressed the crucial fact that Scopo made the statements. Accordingly, we reject Scopo's challenge to the trial court's refusal to issue subpoenas for his proposed industry witnesses.

## C. Admissibility of Certain Tapes

██ Part of the government's proof that Scopo and Montemarano were members of the Colombo crime family consisted of surveillance tapes of conversations intercepted at a Manhattan social club pursuant to court orders entered under Title III of the Omnibus Crime Control and Safe Streets Act ("Title III"), 18 U.S.C. §§ 2510–2521 (1982 & Supp. IV 1986). These tapes had been judicially sealed in accordance with 18 U.S.C. § 2518(8)(a). When they were offered at the trial of Scopo and Montemarano, defendants objected on the ground that the tapes as then offered were not sealed.

The district court, declining to reach the issue of whether defendants had waived their objection by failing to raise it prior to trial, *see id.* § 2518(10)(a), overruled the objection on the ground that the tapes had been unsealed pursuant to court orders for use in several cases including the present case, *Salerno I,* and a second Salerno case, *United States v. Salerno,* No. 86 Cr. 245 (S.D.N.Y. May 1, 1986) (*"Salerno II"*), and that there is no statutory requirement that judicially unsealed tapes be resealed.

Defendants renew their challenge here, arguing that the tapes should have been resealed in order to ensure their integrity. Though we would agree that at some point resealing should occur, that point was not reached here.

As we have noted, an important purpose of the statutory sealing requirement is the prevention of manipulation or alteration of the recordings of the intercepted conversations. *United States v. Massino,* 784 F.2d 153, 156 (2d Cir.1986); *United States v. Gigante,* 538 F.2d 502, 505–06 (2d Cir. 1976). Thus, tapes made pursuant to Title III may not be admitted in evidence without "the seal provided for by [§ 2518(8)(a) ], or a satisfactory explanation for the absence thereof." 18 U.S.C. § 2518(8)(a). The statute envisions "continuous judicial scrutiny of the entire process of obtaining and utilizing recorded conversations," *United States v. Gigante,* 538 F.2d at 506, and we are persuaded that once the trial level proceedings to which the unsealing order pertained have concluded, the tapes should be resealed in order to preserve their integrity should their admission be sought in another trial—either in another case or in a retrial of the same case after appeal.

■■ Nonetheless, absent some condition imposed by the unsealing judge, we conclude that where tapes have been unsealed pursuant to court order for use in given proceedings, there is no requirement that they be resealed prior to the conclusion of those proceedings. For this reason, we reject defendants' challenge to the admission of the tapes in question on this appeal. The proceedings in *Salerno II,* for which an unsealing order had been entered, were still in progress at the time Scopo and Montemarano went to trial. Hence the absence of a seal was satisfactorily explained.

### D. *Other Contentions*

Defendants' remaining contentions include challenges to the court's evidentiary rulings and to its supervision of the jury. None of them requires extended discussion.

#### 1. *Admissibility of the Funeral Photos*

■ In support of the allegation that Montemarano was a member of the Colombo family, the government offered, *inter alia,* surveillance photographs that showed him outside a church before and after a funeral, mingling with other members of organized crime. Montemarano objected to the introduction of this evidence on the ground that it infringed his First Amendment right to freely exercise his religion. In a Memorandum Opinion and Order dated July 6, 1987, the district court overruled the objection, noting that the photos did not depict the celebration of any religious practice but only the "mingling of persons in public view before or after services"; it concluded that the "remote, indirect effect" of the government's covert surveillance of the exterior of the church was clearly "outweighed by the compelling interest of society in the effective enforcement of its penal laws." We agree.

Recognizing that an individual aware of government surveillance at his place of worship could feel a chilling effect on his exercise of religion, we think it appropriate to analyze Montemarano's contention within the three-part framework set forth in *Branzburg v. Hayes,* 408 U.S. 665, 700, 92 S.Ct. 2646, 2666, 33 L.Ed.2d 626 (1972). Under that analysis, in order to justify intrusion into an individual's first amendment rights, the government must show that its actions (1) pursue a "compelling" state interest, *id.,* (2) " 'bear[ ] a reasonable relationship to the achievement of the governmental purpose,' " *id.* (quoting *Bates v. City of Little Rock,* 361 U.S. 516, 525, 80 S.Ct. 412, 417–18, 4 L.Ed.2d 480 (1960)), and (3) are not an "unduly broad means

[that] unnecessar[ily] impact on protected rights," *Branzburg v. Hayes,* 408 U.S. at 680–81, 92 S.Ct. at 2652. We conclude that the government has carried its burden.

Investigation of suspected criminals is a fundamental and compelling interest. Investigations with respect to certain types of suspected criminal activity, such as conspiracy or RICO violations, must focus on interactions between two or more persons. Such interactions are likely to be covert, and the opportunities to document them, especially between or among organized crime figures, are rare. Use of ordinary surveillance techniques in public places bears a reasonable relationship to the governmental goal. We see no error in the district court's finding that the surveillance conducted here was no more intrusive than was necessary in order to record the interactions. The photos were not taken inside the church and did not record any religious ceremony; rather, they were taken before and after the ceremonies. In addition, they were taken covertly, thus avoiding any potentially menacing effect that might be felt from a perceptible government presence.

We conclude that the *Branzburg* test was met and that the district court did not err in rejecting Montemarano's First Amendment argument.

### 2. *Admissibility of the Agro Plea of Guilty*

Count 13 of the redacted indictment charged that Montemarano had participated in the bribery of a federal prison official in an effort to have Persico transferred from the prison he was in to a preferred prison. In support of this charge, the government presented evidence that Montemarano had approached one Thomas Agro, a soldier in the Gambino organized crime family, seeking permission to have one of Agro's underlings arrange the transfer, and that Agro had cooperated in these efforts. Agro was later indicted on a variety of charges in another case, and part of the government's evidence on count 13 in the present case was Agro's allocution in connection with his 1987 plea of guilty to two counts of racketeering in that

case, *United States v. Agro,* No. 86 Cr. 452 (E.D.N.Y. Feb. 11, 1987). In that allocution, Agro admitted that from August 1981 to September 1982, he and others (unnamed) had attempted, by means of bribery, to move Carmine Persico "through the prison system."

Over Montemarano's hearsay objection, the trial court admitted the Agro allocution into evidence on the ground that it was a declaration against Agro's penal interest and thus not excludable as hearsay. *See* Fed.R.Evid. 804(b)(3). Montemarano challenges this ruling, arguing that in fact Agro was terminally ill at the time of his plea and that his plea of guilty served to keep him out of prison and hence was not really against his penal interest. We find no error in the court's ruling.

█ In general a plea of guilty is a statement against the penal interest of the pleader for the obvious reason that it exposes him to criminal liability. *See, e.g., United States v. Winley,* 638 F.2d 560 (2d Cir.1981), *cert. denied,* 455 U.S. 959, 102 S.Ct. 1472, 71 L.Ed.2d 678 (1982). Likewise, so much of the allocution as states that that defendant committed or participated in the commission of a crime, thereby permitting the court to accept the plea, *see* Fed.R.Crim.P. 11(e), is normally against his interest. If, however, a pleading defendant had an agreement with the government or with the court that he would not be punished for the crimes to which he allocuted, then that allocution would not subject him to criminal liability and would not constitute a statement against his penal interest within the meaning of Rule 804(b)(3).

█ Agro's plea and allocution were properly viewed as statements against his penal interest. The plea exposed him to a potential sentence of 40 years' imprisonment and fines totaling $275,000. There is no evidence that he had entered into any understanding with the government or the court that he would not be sentenced for the crimes to which he allocuted. And while we stress that a defendant's unilateral belief would not suffice to neutralize the exposure ordinarily inherent in a self-incriminating plea or allocution, we also point

out that even if Agro privately believed that because of his illness the court would not require him to suffer incarceration, there would be little reason for him to suppose that the court would also therefore excuse him from paying a fine.

### 3. *Jury Exposure to Publicity During Trial*

During the trial, the Tuesday June 23, 1987 editions of the *New York Post* published an article discussing the legal difficulties of Bess Myerson; accompanying the article was a series of photographs of seven men, including Scopo. Under Scopo's picture was the caption "Ralph Scopo: former president of Cement and Concrete Workers' Union convicted in 'Commission Case,' now serving 100 years." The June 23 *Post* was seen by several of the jurors. Defendants contend that they are entitled to a new trial because the trial court inadequately explored the potential prejudicial effect of the jurors' exposure to the article. We disagree.

When jurors have been exposed to prejudicial publicity during trial, the trial court must determine "whether the jurors retained the requisite impartiality." *United States v. Gigante*, 729 F.2d 78, 82 (2d Cir.), *cert. denied*, 467 U.S. 1206, 104 S.Ct. 2390, 81 L.Ed.2d 348 (1984). We have approved a three-step process that may be followed by the trial judge to determine whether prejudicial publicity requires a mistrial:

> The simple three-step process is, first, to determine whether the coverage has a potential for unfair prejudice, second, to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individually exposed jurors—outside the presence of the other jurors—to ascertain how much they know of the distracting publicity and what effect, if any, it has had on that juror's ability to decide the case fairly.

*United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987). The trial court is accorded substantial discretion in making these determinations, and its con-

clusion that the jurors remained impartial will not be overturned on appeal absent an abuse of discretion. We find no abuse of discretion here.

The matter of the *Post* article was called to the court's attention by Scopo's stand-by counsel on Thursday June 25, there having been no trial session on June 24. The court promptly distributed to the jurors questionnaires asking whether they had read the *Post* "since Monday of this week," and if so whether they had read anything about anyone connected with the present case. Seven jurors responded in the affirmative to at least one of the two questions; those jurors were questioned by the trial judge in open court, with the other jurors absent; each juror was admonished not to discuss the court's questions with the other jurors.

Of the jurors questioned, one, although he had not read anything about Scopo, had been told the substance of the caption by someone unconnected with the case. This juror doubted his continued ability to judge Scopo impartially, and he was dismissed from the jury. Five of the jurors stated that they had seen (or thought they had seen) the picture of Scopo and read the name "Ralph Scopo" but had not read the rest of the caption; each said that seeing Scopo's picture in the paper had not affected his or her ability to be a fair and impartial juror. The seventh juror (No. 7) stated that she had seen the pictures and "recognized the names," but had flipped the page and "didn't read anything." She stated that what she had seen would not affect her judgment concerning any defendant.

In addition to these seven jurors, the court questioned one juror (No. 4) who had answered both parts of the questionnaire in the negative. Juror No. 4 was questioned because one of the seven said she had seen Scopo's picture while looking over the shoulder of No. 4, who was holding the paper. Juror No. 4, when questioned by the court, admitted he had been mistaken about his negative response and stated that he had not read the *Post* on Tuesday. The court pointed out that it had not asked anything about Tuesday, and it renewed the question as to whether No. 4 had read

the *Post* since Monday. No. 4 stated that because there had been no court session on Wednesday, he had lost track of what days the court's questions addressed; he stated that he had not read the *Post* earlier in the week and had not seen anything in the *Post* about anyone connected with this case. The court asked if he was sure; he responded that he was.

In this Court, defendants contend that the trial court should have pursued the questioning of juror No. 4 because of his reference to "Tuesday" and of juror No. 7 because her statement that she "didn't read anything" was inconsistent with her statement that she had seen the names under the pictures. As to No. 7, we disagree; though defendants promptly asked the trial court to question her further, evaluation of the juror's credibility was within the province of the court, and the court was entitled to accept the juror's statement that she had seen the pictures and the names but had not read the news story or any other part of the captions. As to No. 4, perhaps more questions could have been asked; but the court did not fail to cross-examine the answers given, and its further questioning elicited the responses that the juror had not read anything about anyone connected with the case. There is no indication in the record that defendants suggested any additional probing of juror No. 4, and we cannot say that the decision to credit the responses elicited was an abuse of the court's discretion.

### 4. *The Excusing and Nonreplacement of a Juror*

 On the second day of jury deliberations, a juror informed the court that because of the illness of his mother and his inability to be in contact with her during deliberations, he felt he would be unable to render a fair verdict. All parties agreed that the juror should be excused. Defendants then moved for a mistrial, and when that motion was denied, they urged the court to substitute an alternate juror for the excused juror. The court decided to have the jury proceed with 11 jurors, stating its understanding that this was the preferred method. Defendants contend

that this constituted reversible error. This contention has no merit.

Fed.R.Crim.P. 23(b) provides, in pertinent part, that "if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors." This Court has stated that proceeding with 11 jurors is the "preferred" option. *See United States v. Stratton*, 779 F.2d 820, 831 (2d Cir.1985), *cert. denied*, 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986); *see also United States v. Gambino*, 788 F.2d 938, 948–49 (3d Cir.), *cert. denied*, 479 U.S. 825, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986). Accordingly, we reject defendants' challenge.

### CONCLUSION

We have considered all of the arguments made by defendants on these appeals and have found them to be without merit. The judgments of conviction are affirmed.