**UNITED STATES of America,**

v.

**Mario GIGANTE, et al., Defendants.**

**No. 96 Cr. 0466 (JSR).**

United States District Court,
S.D. New York.

Sept. 2, 1997.

Ronald Rubinstein, Rubinstein & Corozzo, P.C., New York City, for Louis Corso.

J. Bruce Maffeo, Seiff & Kretz, New York City, for Nicholas Milo.

John Pollok, Hoffman & Pollok, New York City, for Thomas Milo.

Patrick Burke, Burke, McGlinn & Miele, Sufferen, NY, for Frank Celli.

Anthony V. Lombardino, Richmond Hill, NY, Harold F. McGuire, Jr. McGuire, Kehl & Nealon, LLP, New York City for Benny Villiani.

John Kase, Kase & Durker, Garden City, NY, for Chestnut Equipment, DMF Excavating, Mamaroneck Truck, Recycling Industries, Suburban Carting and Trottown Transfer.

Suzanne Mondo, New York City, for J&T Recycling.

Gerald Damiani, McCormack, Damiani, Lowe & Mellion, New York City, for All–Waste System.

Donald Mitchell, Danbury, CT, for Acorn Equipment.

Judd Burstein, Burstein & Fass LLP, New York City, for Al Turi Landfill.

Gerald Shargel, New York City, for Enviro Express.

Franklin Velli, Christy & Viener, New York City, for Compaction Systems.

Jay Goldberg, Jay Goldberg PC, New York City, Thomas Butler, Butler, Fitzgerald & Potter PC, New York City for Mawah Homes and Route 55 Corp.

Thomas Arena, U.S. Attorney's Office, White Plains, NY, Stan Okula, U.S. Attorney's Office, Brooklyn, NY, for U.S.

Jack Litman, Litman, Asche, Lipkin & Giorella, New York City, for Mario Gigante.

James Larossa, New York City, for Salvatore Gigante.

## MEMORANDUM ORDER

RAKOFF, District Judge.

Upon consideration of the parties' written submissions, their oral arguments heard on July 14, 1997, an *ex parte in camera* hearing held on July 15, 1997,[1] and the entire record herein, defendants' pending pretrial motions are hereby decided as follows:

1. The transcript of the *ex parte in camera* hearing held on consent on July 15, 1997 has since been unsealed. *See* Order dated July 21, 1997.

(1) the motion to sever defendants Mario Gigante and Salvatore Gigante is denied;

(2) the motion to dismiss Counts One and Two of the Superseding Information is denied;

(3) the motion to suppress the fruits of a 1993 electronic surveillance of Suburban Carting Corp. ("Suburban") is denied;

(4) the motion to suppress the wiretap evidence obtained pursuant to a June 7, 1989 eavesdropping warrant is denied;

(5) the motion to suppress the fruits of the searches and seizures conducted in 1990 at the premises of Suburban and of All–Waste Systems, Inc. ("All–Waste") is granted as to the records of defendants Enviro Express Inc., Trottown Transfer Inc., DMF Excavating Corp., and Al Turi Landfill Inc., and is denied in all other respects; and

(6) the motion to suppress the tape-recorded evidence derived from electronic surveillance conducted at various times at C&I Trading Co. ("C&I") and at the Palma Boy Social Club ("Palma Boy") is granted as to the C&I tapes and denied as to the Palma Boy tapes.[2]

In addition to the grounds already apparent from the in-court colloquy on July 14, 1997, see transcript, the following considerations led to these rulings.

## I. Severance

■■■ "There is a preference in the federal system for the joint trial of defendants indicted together, making severance inappropriate unless a joint trial would compromise a trial right of the moving defendant or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Aulicino*, 44 F.3d 1102, 1116 (2d Cir.1995). Thus, in considering the motion to sever the two lead defendants, Mario and Salvatore Gigante, from the other nineteen defendants charged in the Superseding Information, the Court is obliged to "pay heed to the powerful institutional interests in judicial economy favoring joint rather than separate trials." *United States v. Henry*, 861 F.Supp. 1190, 1199 (S.D.N.Y.1994). As the

Supreme Court explained in *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987):

It would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

*Id.* at 210, 107 S.Ct. at 1708–09; *see also Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993).

Against all this, defendants offer precious little in support of their request to sever, not some peripheral defendant, but the two lead defendants, who are named as conspirators in each of the four conspiracies charged against the other nineteen defendants in the Superseding Information. Thus, although there are many defendants in this case and the crimes alleged are large in number, severance would not meaningfully simplify or shorten the presentation of the evidence, but would simply result in duplicative presentation of the same evidence at two separate trials.

Furthermore, while the case is large, it is by no means complex. *See United States v. DiNome*, 954 F.2d 839, 842 (2d Cir.), *cert. denied*, 506 U.S. 830, 113 S.Ct. 94, 95, 121 L.Ed.2d 56 (1992) ("the alleged complexity stem[s] more from the abundance of evidence than from the subtlety of the analysis needed to consider it"). The Court's inquiry at the July 14 hearing confirmed the reasonableness of the Government's estimate that its

---

**2.** Defendants' motion for an audibility hearing was previously granted on consent, but the hearing was deferred until October 23, 1997.

case would take no more than twelve to fourteen weeks to present, *see United States v. Casamento,* 887 F.2d 1141, 1152 (2d Cir. 1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). If anything, this is probably an over-estimate. Accordingly, what we have here is a large but straightforward case centered on the lead defendants, whose presence in a joint trial with the other defendants is altogether appropriate. The motion to sever is therefore denied.

## II. Dismissal of Counts One and Two of the Information

■ Based on a talmudic-like analysis of a few arguably ambiguous words in Counts One and Two of the Superseding Information (the "RICO Counts"), defendants argue that these counts improperly charge the defendants with collectively engaging in a single pattern of racketeering activity that includes all defendants' predicate acts, rather than charging each defendant with individually engaging in a specified, individualized pattern of racketeering consisting only of that defendant's own predicate acts. *See United States v. Persico,* 832 F.2d 705, 714 (2d Cir.1987), *cert. denied,* 486 U.S. 1022, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988). However, for reasons already fully explored at the July 14 hearing, *see* transcript, the Court concludes that, while some of the language contained in Counts One and Two might have been more carefully drafted, each count nonetheless fully apprises each individual defendant of the respective individual pattern of racketeering activity with which that defendant is individually charged. Thus, the Information affords adequate notice (as well as sufficient double jeopardy protection) with respect to both RICO Counts. Any further problem with respect to the clarity of those counts can be resolved by appropriate instructions to the jury. Accordingly, defendants' motion to dismiss Counts One and Two of the Superseding Information is denied.

## III. The 1993 Suburban "Bug"

■ Before issuing an order for a wiretap or other such surveillance, "the judge must determine, based on the facts in the [Government's] affidavit, that there is probable cause to believe that a crime has been, is being, or is about to be committed; probable cause to believe that communications about the crime will be obtained through the wiretap; that alternative means have tried and failed or appear too dangerous or unlikely to succeed; and probable cause that the premises to be wiretapped are being used for criminal purposes or are used or owned by the target of the wiretap." *United States v. Wagner,* 989 F.2d 69, 71 (2d Cir.1993). *See* 18 U.S.C. § 2518. In subsequently reviewing these determinations, the trial court must accord substantial deference to the findings of the issuing judicial officer, limiting its review to whether the issuing judicial officer had a "substantial basis" for making the requisite findings. *Id.* at 72 (citing *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983)). *See also United States v. Torres,* 901 F.2d 205, 231–23 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). Unaided by the insights of adversarial scrutiny, the issuing judge may not readily perceive every question that might legitimately be raised regarding a requested surveillance; but so long as fundamental constitutional rights are preserved, the issuing court's determination should not be subjected to gratuitous "Monday morning quarterbacking."

■ Here, in their motion to suppress the evidence derived from an electronic and video surveillance of defendant Thomas Milo's office at Suburban (the Suburban "Bug") authorized by the Honorable Vincent L. Broderick on March 1, 1993, defendants raise several separate challenges, none of which is ultimately convincing but two of which warrant comment here. First, they argue that the affidavit of Special Agent Daniel A. Butchko of the FBI submitted in support of the wiretap application (the "Butchko Affidavit") was insufficient to establish probable cause because most of his information was "stale," dating back at least three to five years. However, "the principal factors in assessing whether or not the supporting facts have become stale are [not only] the age of those facts [but also] the nature of the conduct alleged to have violated the law." *United States v. Gallo,* 863 F.2d 185, 191 (2d Cir.1988), *cert. denied,* 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989);

*see also United States v. Martino,* 664 F.2d 860, 867 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982). Where, as here, the supporting affidavit presents "a picture of continuing conduct, as opposed to an isolated instance of wrongdoing ... the passage of time between the last described act and the presentation of the application becomes less significant." *Gallo,* 863 F.2d at 191. Moreover, where, as here, the alleged misconduct relates to large scale economic crimes that, by their very nature, require extended periods of time to bring to fruition, facts even several years removed may, in context, be far from stale. *See Wagner,* 989 F.2d at 75 ("there is no bright line rule for staleness").

■ Further still, seemingly "stale" allegations can be revitalized by additional allegations containing current information. *See United States v. Perry,* 643 F.2d 38, 49–50 (2d Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981) (finding that three year old allegations in affidavit supporting warrant were freshened and given relevance by proof of related current activity); *United States v. Kuntz,* 504 F.Supp. 706, 709–10 (S.D.N.Y.1980). In the instant case, the Butchko Affidavit contains at least five material allegations of recent information obtained from confidential informant "CS–1" (an informant whose reliability is not challenged by defendants) that serve this revitalization function. *See* Butchko Affidavit, at ¶¶ 94, 95, 132, 137(a), 138.[3] These allegations include information concerning recent activities at the premises to be surveilled that fully comport with the prior misconduct and demonstrate that the alleged pattern of racketeering activities were being implemented at those premises as late as February 17, 1993, less than two weeks before the issuance of the wiretap order. Nor can it fairly be said (as defendants contend) that the allegations are vague or uncorroborated: CS–1 was present at or personally observed at least two of the conversations, *see* Butchko Affidavit ¶ 137(a) and 138, and offered extensive corroboration for his hearsay knowledge of the others. In short, the Butchko Affidavit amply establishes probable cause.

■ Defendants' second argument is that the Butchko Affidavit failed to establish another prerequisite to electronic surveillance, to wit, that other investigative techniques had been tried and failed or else appeared too dangerous or unlikely to succeed. *See* 18 U.S.C. § 2518(3)(a)–(d). Specifically, defendants assert that the claim in the Butchko Affidavit that CS–1 and the other "Confidential Sources" would refuse to testify constituted an inadequate showing because the asserted recalcitrance of the informants was merely Agent Butchko's speculation and because the Government could have compelled their testimony through immunity or procured it through their enrollment in the witness protection program.

Even if this were true, it would not of itself warrant suppression, for the Butchko Affidavit also alleged, and defendants do not meaningfully rebut, that the confidential sources were only privy to discrete aspects of the large racketeering pattern alleged. *See* Butchko Affidavit ¶ 140. *See generally United States v. Torres,* 901 F.2d 205, 231 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). But in any event, the Court, with the consent of all parties, conducted an *in camera* hearing on July 15, 1997 (the transcript of which was subsequently unsealed) to inquire of Agent Butchko regarding the availability of CS–1 and the other confidential informants to testify or otherwise participate more fully in the ongoing investigation at the time his affidavit was signed. Among other things, Agent Butchko testified that a "confidential informant [as that term was used in his Affidavit] is someone who has requested complete confidentiality, who has made it clear to the case agent that he or she will not wear a body recorder and will not ever testify, and they will have to be able to articulate the reasons why they would not wear a recorder or would not testify." *See* 7/15/97 Transcript at 6–7, 11. Agent Butchko further testified that he had personally confirmed such non-availability with the respective case agents assigned to CS–1, CS–2, CS–3, CS–4, and CS–5. *Id.* at 7, 11. For example, the case agent assigned

---

**3.** The Butchko Affidavit also contains several allegations of more recent information obtained from other sources, including CS–2 (¶ 102), CS–3 (¶ 105) and CS–5 (¶ 137(c)).

to CS–1 had reported to Butchko that CS–1 "had a reasonable belief that, if any of the people upon which he was reporting learned that he was cooperating in any fashion with the government and, particularly, with the FBI, that he would be murdered." *Id.* at ·7.

Because the Suburban Bug was supported by probable cause, because the Butchko Affidavit adequately alleged the necessity of the application for a wiretap, and because the Court finds defendants' other arguments (not here discussed) equally unavailing, defendants' motion to suppress the fruits of the Suburban Bug is denied.

## IV. The June 7, 1989 Wiretap Order

■ Defendants also move on similar grounds to suppress all evidence derived from a wiretap authorized by the Honorable Gerard L. Goettel, U.S.D.J., on June 7, 1989. Specifically, defendants here argue that the affidavit of Special Agent David M. Rhieu of the FBI submitted in support of the wiretap application (the "1989 Rhieu Affidavit") was insufficient to establish either the necessity for the tap or the existence of probable cause.[4]

Neither of these arguments is persuasive. The 1989 Rhieu Affidavit not only detailed why the traditional methods utilized to that date in the investigation had provided only a limited picture of the participants' schemes and the extent of their illegal activities, but also explained that further reliance on these methods alone would be inadequate because (1) the confidential source and other potential witnesses identified by the Government had refused to testify, (2) the testimony of cooperating witness Alan Reiter would be circumscribed by his limited knowledge, and (3) the institution of a wide-ranging investigation could jeopardize the safety of Reiter, the Government's undercover agent, the confidential informant, and possibly others. *See, e.g.,* 1989 Rhieu Aff. at ¶ 76(d). These allegations, together with the Affidavit's extensive evidence of a "large scale operation which could not be adequately surveilled by traditional investigative methods," is more than sufficient to establish necessity. *Torres,* 901 F.2d at 232.

· Likewise, the 1989 Rhieu Affidavit sufficiently established probable cause to believe the defendants were committing the particular crimes there alleged. For example, even though defendants allege that the Affidavit's allegations were stale, the specific and detailed allegations of money laundering, in violation of 12 U.S.C. § 3403(c), span the period from 1985 to May 16, 1989—just three weeks before the wiretap order was sought. 1989 Rhieu Aff. ¶¶ 28–53. Without recounting each detail, the Court concludes that the June 7, 1989 wiretap order was supported by both necessity and probable cause, and hence defendants' motion to suppress the fruits of that order is denied.

## V. The Search and Seizure Issues

■ A more substantial issue is presented with respect to the defendants' motions to suppress the fruits of the 1990 searches of Suburban and All–Waste. Specifically, on August 16, 1990, federal and New York State agents searched the offices of Suburban and of All–Waste pursuant to warrants issued by the Honorable Gerard L. Goettel. Both warrants were supported by an affidavit sworn to by FBI Special Agent David M. Rhieu on August 15, 1990 (the "1990 Rhieu Affidavit"). Various of the defendants here move to suppress the evidence seized during the Suburban and All–Waste searches on the grounds that the affidavit failed to establish probable cause and that the warrants failed to describe with particularity the items to be seized. While not objecting to the movants' standing to bring such a motion, the Government resists both these arguments on the merits.

As to probable cause, the 1990 Rhieu Affidavit provided ample basis for concluding that evidence of criminal activity would be found at the premises both of Suburban and All–Waste. *See Illinois v. Gates,* 462 U.S. 213, 237, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *United States v. Thomas,* 757 F.2d 1359, 1367–68 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 67, 88 L.Ed.2d 54 (1985). For example, the affidavit detailed extensive

---

**4.** Although in *United States v. Mongelli,* 799 F.Supp. 21 (S.D.N.Y.1992), Judge Broderick considered a challenge to the adequacy of the Rhieu Affidavit in support of the surveillance ordered, he did not reach the specific challenges here raised.

money laundering activities executed at Suburban's premises by various defendants utilizing Suburban's facilities, *see, e.g.,* 1990 Rhieu Aff. ¶¶ 30, 104, 222, 225, as well as bribery schemes hatched on the premises, *see, e.g., id.* at ¶ 191. Similarly, the affidavit detailed meetings of various defendants associated with All–Waste to discuss and implement various antitrust violations, *see, e.g., id.* at ¶¶ 31–35, as well as to further money-laundering schemes, *see, e.g., id.* at ¶¶ 230–33.

■■■ However, the question of whether the warrants provide sufficient particularity to prevent "a general, exploratory rummaging," *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971), is more problematic. Each of the warrants describes five categories of materials to be seized. While categories "(2)" and "(3)" may arguably be sufficiently defined in the context of a money-laundering search,[5] categories "(1)", "(4)", and "(5)" are rather more broad and vague. They read as follows:

(1) financial, banking, safe deposit, investment, asset, tax, bookkeeping, and accounting records—along with underlying, supporting, and related documentation—of or referring or relating to (a) Louis J. Mongelli, Robert A. Mongelli, Louis J. Mongelli, Jr., Thomas Milo, Nick Milo, Frank Celli, and Mario Gigante (hereinafter collectively referred to as "the named subjects"); (b) members of the named subjects' immediate families; (c) criminal associates of the named subjects; (d) entities owned, controlled or otherwise utilized for illegal purposes by or on behalf of the named subjects and/or their criminal associates;

. . . . .

(4) telephone records, rolodexes, personal telephone books, correspondence, applications, memoranda, notes, tape recordings, photographs, videotapes, documents, and computer records (including electronically-stored data, computer equipment and peripherals, software to operate same, and related instruction manuals) referring or re-

lating to (a) bribery of public officials and others (bank officers or employees, accountants, tax preparers, etc.) and other illegal activity which the bribe recipients have been, are, and/or will be aiding and abetting; (b) hidden owners or partners of the named subjects; (c) Organized Crime Members or associates; (d) bid rigging, dividing up of stops between supposed competitors, and other practices in restraint of trade or commerce;

(5) other evidence, fruits, and instrumentalities of substantive and/or conspiracy violations of Title 18, United States Code, Sections 1962, 1963, 1951, and 666; Title 26, United States Code, Sections 7201 and 7206; Title 31, United States Code, Sections 5324 and 5322; and Title 15, United States Code, Section 1.

On their face, these three categories appear bereft of meaningful "limitation curtailing the officers' discretion when executing the warrant." *See United States v. George,* 975 F.2d 72, 76 (2d Cir.1992). Thus, category "(1)" specifies neither to whom the "criminal associates of the named subjects" refer nor what "entities owned, controlled or otherwise utilized for illegal purposes by or on behalf of the named subjects and/or their criminal associates" include. Similarly, category "(4)" fails to specify what is meant by "other illegal activity which the bribe recipients have been, are, and/or will be aiding and abetting." Further still, category "(5)", by authorizing searches and seizures of evidence relating to violations of such an immensely broad statute as 18 U.S.C. § 1962 ("RICO"), seemingly provides no limits at all. *See George,* 975 F.2d at 76 ("Mere reference to 'evidence' of a violation of a broad criminal statute or general criminal activity provides no readily ascertainable guidelines for the executing officers as to what items to seize"). *See also United States v. Leary,* 846 F.2d 592, 601–02 (10th Cir.1988). Furthermore, the sheer volume of documents seized in the

---

5. They are: "(2) cash; (3) keys and/or combinations to or for safe deposit boxes, safes, and/or     other storage facilities."

execution of the warrants[6] arguably evidences the possibility that the warrant did not "enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *George*, 975 F.2d at 75.

On the other hand, the 1990 Rhieu Affidavit provided significant guidance to the agents executing the warrants as to how to construe many of the facially overbroad terms in the warrants. For example, the Affidavit sets forth a list of entities thought to be controlled by the defendants' alleged criminal associates. *See, e.g.*, 1990 Rhieu Aff. at ¶ 193, n. 45. Moreover, the very nature of the broad economic crimes detailed in the Affidavit provides a reasonable basis for ascribing evidentiary relevance to most of the records seized. It is also plain that the seizure of many of the items set forth in the 36–page inventory of seized items can be justified under those provisions of categories "(1)", "(4)" and "(5)" that are reasonably particularized, even if they also fit within the overbroad provisions of the same categories. *See United States v. Moetamedi*, 46 F.3d 225, 230 (2d Cir.(1995).)

Balancing these competing considerations, the Court finds guidance in the fact that, in the end, the only material evidence that the defendants can specifically particularize as being beyond the scope of the warrants are the records of Enviro Express, Inc., Trottown Transfer, Inc., DMF Excavating Corp., Recycling Industries Corp. and Al–Turi Landfill, Inc. Neither the warrants nor the 1990 Rhieu Affidavit refers to these records, and any reasonable executing agent should have known that the warrants did not authorize their seizure. Accordingly, defendants' motion to suppress these, but only these, documents is granted.

## VI.   The Resealing Issues

■ Finally, defendants move to suppress the tape recordings of conversations intercepted from the premises of C&I and Palma Boy (*see* p. 962, *supra*), on the ground that the tapes, after being previously unsealed, were not judicially resealed in timely

fashion. 18 U.S.C. § 2518(8) provides in pertinent part that "Immediately upon the expiration of the period of the [intercept] order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions.... The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire, oral, or electronic communication or evidence derived therefrom...."

This language was interpreted in *United States v. Scopo*, 861 F.2d 339 (2d Cir.1988), *cert. denied*, 490 U.S. 1048, 109 S.Ct. 1957, 104 L.Ed.2d 426 (1989), to require not only prompt judicial sealing of electronic surveillance tapes at the expiration of the ordered surveillance period, but also prompt judicial resealing of such tapes at the expiration of any subsequent period of judicially ordered unsealing (such as for use at trial). As the Second Circuit stated in *Scopo*:

> [Section 2518(8)(a) ] envisions 'continuous judicial scrutiny of the entire process of obtaining and utilizing recorded conversations,' ... and we are persuaded that once the trial level proceedings to which the unsealing order pertained have concluded, the tapes should be resealed in order to preserve their integrity should their admission be sought in another trial—either in another case or in a retrial of the same case after appeal.

*Id.* at 347. Although questioned by other Circuits, this holding was reaffirmed by the Second Circuit a year later in *United States v. Long*, 917 F.2d 691, 700 (2d Cir.1990).

With respect to the C&I tapes, the parties agree that the tapes were judicially unsealed for various purposes beginning in 1985 and never judicially resealed until 1995, a period of ten years. While the Government, prior to *Scopo*, had a good faith basis for not judicially resealing the tapes, *see Long*, that excuse disappeared after *Scopo* and *Long* were decided in 1988 and 1990, respectively,

---

**6.** According to the defense estimate, approximately 80% of the thousands of documents on Suburban's premises were seized. Cherico Aff.

¶ 8. According to the Government, it was approximately 75%. Siracusa Aff. ¶ 6–7.

yet the Government made no effort to seek judicial re-sealing of the tapes until 1995. The fact that the tapes were (allegedly) physically resealed by the Government prior to this time does not constitute a legally sufficient excuse for the prolonged failure to obtain judicial resealing. See *United States v. Ojeda Rios*, 495 U.S. 257, 264, 110 S.Ct. 1845, 1849–50, 109 L.Ed.2d 224 (1990). Accordingly, the C&I tapes must be suppressed.

By contrast, the Palma Boy tapes were judicially resealed in 1991, at the timely completion of a trial in the District of New Jersey for which they had been judicially unsealed in September, 1989. While some of these tapes had been previously unsealed in May, 1986, for "use in connection with trial in [*United States v. Salerno*, Docket No. 86 Cr. 245,] and in any related judicial proceedings," the related proceedings in that case proved protracted and did not fully conclude until at or about the time of the separate September 13, 1989 unsealing order. Accordingly, while the motion to suppress the C&I tapes must be granted, the motion to suppress the Palma Boy tapes must be denied.

SO ORDERED.