**UNITED STATES of America**

v.

**Anthony CASSO, et al.**

**No. CR 90–446(s–4).**

United States District Court, E.D. New York.

Feb. 8, 1994.

Zachary W. Carter, U.S. Atty. (Gregory O'Connell, Charles Rose, Kevin McGrath, Asst. U.S. Attys., of counsel), Brooklyn, NY, for plaintiff.

Michael Rosen, New York City, for defendant Anthony Casso.

Jay Goldberg, and Gallop, Dawson, Clayman & Rosenberg (Brian D. Linder, of counsel), New York City, for defendant Salvatore Avellino.

James Froccaro, Port Washington, NY, for defendant Frank Lastorino.

Jay Horlick, New York City, for defendant Richard Pagliarulo.

Michael Warshor, New York City, for defendant Michael DeSantis.

Papa, Depaola & Brounstein (Steven L. Brounstein, of counsel), Flushing, NY, for defendant Michael Spinelli.

Freeman, Nooter & Ginsberg (Lee Ginsberg, of counsel), New York City, for defendant Thomas Carew.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Defendants, alleged members or associates of the so-called Luchese Organized Crime Family, have been indicted in seventy-two counts for various violations of the United States Criminal Code, including racketeering, 18 U.S.C. § 1962(c), racketeering conspiracy, 18 U.S.C. § 1962(d), murder, 18 U.S.C. § 1952B(a)(1), conspiracy to murder, 18 U.S.C. § 1959(a)(5), attempted murder, 18 U.S.C. § 1959(a)(5), labor payoffs, 29 U.S.C. § 186(b)(1), labor payoff conspiracy, 18 U.S.C. § 371, extortion conspiracy, 18 U.S.C. § 1951, and conspiracy to defraud the United States, 18 U.S.C. § 371.

The court has before it motions by defendant Anthony Casso, allegedly the Underboss of the Luchese Family, and by defendants Salvatore Avellino and Frank Lastorino, both allegedly Captains in the Luchese Family.

Casso, Lastorino, and Avellino have moved pursuant to the Fourth Amendment to the United States Constitution, 18 U.S.C. § 2510 *et seq.*, and Federal Rule of Criminal Procedure 12(b)(3), for an order suppressing their monitored conversations obtained from electronic surveillance of three cellular telephones. Casso has also moved to suppress the fruits of searches of a residence in New Jersey and of two safe deposit boxes. Lastorino and Avellino have moved to suppress the fruits of searches of their residences. Avellino has moved for a bill of particulars.

### The Lastorino Wiretap

■ Casso and Lastorino say that the warrant to wiretap two Brooklyn cellular telephones used by Lastorino was obtained without probable cause.

The affidavit in support of the application to wiretap, sworn to December 7, 1992, says

that there is probable cause to believe that Lastorino and his co-conspirator are harboring a fugitive, George Zappola, in violation of New York Penal Law §§ 205.65 and 205.60. It cites multiple sources for probable cause to believe that Lastorino was using the two phones in question, was in regular contact with Zappola, and was hindering apprehension of Zappola. These sources include information from two reliable confidential informants, physical surveillances, pen registers, and telephone records. The affidavit also explains the relationship between Casso, Lastorino, Zappola and other members and associates of the Luchese Family.

Defendants argue that the affidavit was insufficient because, as added confirmation of Zappola's criminal activities, it refers to what defendants say is unbelievable 1991 testimony of one Dominick Costa, a former member of the Luchese Family.

According to the government, Costa was a government witness in a prosecution of members of the so-called Bypass Gang, a sophisticated burglary ring. Zappola was a codefendant but not tried because he had absconded. Costa testified that Zappola participated in some of the burglaries and also that there had been an unsuccessful attempt on Costa's own life. He identified two of the then defendants, Michael Bloome and Salvatore Fusco, as engaged in the attempt. Both were convicted.

In September 1993 the United States Attorney asked the court to vacate the convictions of Bloome and Fusco. The government had by then received an admission from one Carmine Sessa that he had shot Costa. After further investigation the United States Attorney concluded that during a suppression hearing a civilian witness had falsely denied she had been shown photographs shortly before viewing an array containing Fusco's photograph. During the same hearing a law enforcement official (apparently a local official), who had shown her the photographs before the viewing, misled the court concerning the circumstances of the photographic identification.

Contrary to the implication of defendants, the government did not tell the court that Costa had perjured himself.

There was ample evidence to justify issuance of the warrant even absent any reference to Costa's testimony, which provided mere general information about Zappola's criminal background. Moreover, there is no showing, indeed no suggestion, that the government had information that Costa had testified untruthfully and withheld that information in applying for the wiretap. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). This court concludes that the affidavit was sufficient to show probable cause. *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983); *United States v. Gotti,* 794 F.2d 773, 777 (2d Cir.1986); *United States v. Gallo,* 863 F.2d 185, 191 (2d Cir.1988), *cert. denied,* 489 U.S. 1083, 109 S.Ct. 1539, 103 L.Ed.2d 843 (1989).

■ Defendants also urge that the recordings should be suppressed because not sealed within the requisite statutory period.

Under 18 U.S.C. § 2518(8)(a) recordings must be sealed "[i]mmediately upon the expiration of the period of the order." Defendants say that the interceptions ceased on January 6, 1993, that the tapes were not sealed until January 8, 1993, and that thus the government did not seal "immediately" and had provided no explanation for the delay.

The sealing was timely under the ruling in *United States v. Massino,* 784 F.2d 153, 158 (2d Cir.1986). There the court said, in pertinent part: "In future cases, we direct the following procedure. Tapes should generally be sealed within two days of the expiration of the wiretap order. If the government does not meet this schedule but completes the sealing within five days of the expiration of the order, it shall file *in camera* with the court an explanation, with supporting affidavits, of the reasons for the delay." *See also United States v. Ojeda Rios,* 875 F.2d 17, 20 (2d Cir.1989); *United States v. Pitera,* 5 F.3d 624, 627 (2d Cir.1993).

The order authorizing the Lastorino wiretap was valid.

## The Casso Wiretap

The order authorizing the Casso wiretap was issued on January 13, 1993 by Judge Dickinson R. Debevoise of the United States District Court for the District of New Jersey. It states that it appears that Casso and Lastorino have committed, are committing, and are about to commit crimes of racketeering, extortion, and murder, that Casso is a fugitive, that his location and evidence of those crimes will be obtained through the wiretap, that normal investigative procedures have been tried and have failed, and that other procedures reasonably appear to be unlikely to succeed, if tried, or are too dangerous.

■ Casso, who became a fugitive on May 7, 1990, argues that the application for the wiretap was improper because the government could have found and arrested him through normal investigative means and because the government did not intend to use the wiretap to develop a RICO conspiracy case against him and the Luchese Family.

The affidavit, sworn to on January 13, 1993 by Special Agent Hoyt M. Peavey of the Federal Bureau of Investigation, summarizes the history and extensive criminal activities of the Luchese Family, including its New Jersey component, and describes some of the efforts to find Casso. In January of 1993, through interceptions of calls from Casso to Lastorino over one of the monitored Brooklyn telephones, the government identified the calls as coming from a particular cellular phone. Authorities then traced one of these Casso calls as emanating from a grid in Northern New Jersey, the area where 79 Waterloo Road, Budd Lake, the residence of Rosemarie Billotti, a long time close friend of Casso, was located.

According to the affidavit, the intercepted calls between Casso and Lastorino revealed that they were extorting funds with the assistance of other Luchese Family members and were otherwise engaged in criminal activity.

The affidavit concludes that it is highly likely that Casso and Lastorino would discuss their criminal activity in the most secure manner possible, that use of cellular telephone affords a measure of security, and that

the requested wiretap would disclose evidence of further racketeering offenses and in addition would enable the authorities to catch Casso.

In describing the inadequacy of normal techniques to accomplish these two objectives, the affidavit says the discovery of the cellular telephone represents the best opportunity to find and arrest Casso, an objective unsuccessfully sought for nineteen months. Moreover, normal techniques cannot succeed in revealing the scope of the Luchese criminal enterprise, the identities of those participating in it, and the manner and means by which they perform their functions and protect themselves.

The affidavit also details the reasons why physical surveillances, pen registers, toll records, undercover operations, potential witnesses, grand jury investigations, and searches and seizures are inadequate or unfeasible.

Casso argues that the wiretap was useless to develop a RICO case against the Luchese Family and that the government sought merely to affirm Casso's presence at the Budd Lake residence, an objective available, indeed already obtained, through normal investigative means.

There is no basis for the contention that the wiretap would have been of no value in developing a RICO conspiracy case against Casso and the Luchese Family. It is true, as Casso says, that the government had obtained sufficient evidence to bring other cases involving that family, notably the so-called "Windows" and "Amuso" cases, CR 90–446(S–1). But because some members of the Luchese Family had been successfully prosecuted did not mean that Casso was refraining from crime or that among the hundreds of members or associates of the Luchese Family none had committed or were about to commit other criminal acts. As the affidavit shows, Casso himself had been active in Luchese Family criminal affairs while a fugitive even after Amuso's conviction in 1992.

A legitimate purpose of the application for the wiretap was to obtain additional evidence of Luchese Family criminal activities. The fact that the wiretap became inactive after Casso was arrested and was no longer able to use the cellular phone in question is of no significance.

Moreover, Casso had been a fugitive since May 7, 1990 and had not been caught. While the Budd Lake address was one of the places the government supposed Casso might be hiding, there was no assurance in the absence of the wiretap that he would be there when agents came to arrest him. One of the valid purposes of the wiretap was to obtain that assurance.

The order authorizing the Casso wiretap was valid for both of the objectives for which it was sought.

### The Avellino Tape

Avellino has moved to suppress tape recordings of communications occurring in a Jaguar operated by him, which were intercepted in 1983 pursuant to a New York State court order.

The tapes were sealed before the state court in 1983. In 1986 that court ordered the unsealing of certain of the tapes at the request of the United States Attorney's Office for the Southern District of New York for use in the so-called Commission Case, *United States v. Salerno.* The order directed that at the conclusion of that trial the tapes were to be resealed before the court. Although the trial ended in December 1986, this was never done.

In order to develop a full record the court will hold an evidentiary hearing to determine whether the tapes should or should not be suppressed in the light of *United States v. Scopo,* 861 F.2d 339, 346–47 (2d Cir.1988), and *United States v. Long,* 917 F.2d 691, 700 (2d Cir.1990).

### The Warrant to Search the Budd Lake Residence

The warrant to arrest Casso and to search the Budd Lake residence was issued based on an affidavit sworn to January 18, 1993 by Special Federal Bureau of Investigation Agent Robert J. Lenehan, who had long been engaged in the Luchese Family investigation.

The affidavit incorporates substantial portions of the Peavy affidavit and describes three conversations of Casso intercepted through the New Jersey wiretap already discussed, two with George Zappola, and one with Lastorino.

The affidavit concludes that there is probable cause to believe that Casso was hiding in the residence, that he had been committing various crimes, including violation of RICO, extortion, contract murder and murder in violation of New York and New Jersey law, and that he had with him and inside the residence and in the vehicle located there, fruits, instrumentalities and evidence of such crimes.

The Magistrate Judge issued the warrant authorizing the search for and arrest of Casso and the search for and seizure of

United States currency in an aggregate amount exceeding $2,000, safe deposit box keys, telephone and address type notebooks, notes, business-type records and other documents and items—which contain information about the identities and whereabouts of conspirators and victims and otherwise reveal the origin, receipt, concealment or distribution of criminal proceeds relating to the criminal operations of the Luchese Crime Family in New Jersey and New York involving multiple 'contract' type murders and extortions and the harboring of the said fugitive *and* all of which are fruits, instrumentalities and/or evidence of violations of 18 U.S.C. § 371, (Conspiracy), § 1951 (Hobbs Act Extortion), § 1952 (Travel Act Extortion), § 1958 (Murder–For–Hire), § 1959 (Violent Racketeering Crime), § 1062(c & d) (Rico–Extortion and Murder in violation of the laws of New Jersey and New York), and § 1071 (Harboring a Fugitive).

■ Casso says the warrant was overbroad, particularly in authorizing the seizure of records and documents containing information about the identities and whereabouts of his co-conspirators and victims and otherwise revealing the origin, receipt, concealment or distribution of criminal proceeds. He asserts that the warrant's citation of the statutes allegedly violated shows that the items mentioned in the warrant involved numerous possible violations of law and that this amounts to an invitation to unrestricted rummaging.

Casso concedes that the government may have had probable cause to believe that evidence of extortion was present in the residence but says there was no probable cause to search for and seize evidence of more widespread criminal activity.

Casso's brief appears to argue that the only source of probable cause consisted of the New Jersey telephone calls by Casso, recently intercepted on the wiretap and showing extortion. But the affidavit established that Casso was central to the criminal operation of the Luchese Family. He had been indicted for each of the crimes set forth in the warrant, except for harboring a fugitive.

The facts stated in the affidavit showed why books and other records important to the operation of a crime family had been and probably were still kept by the Luchese Family, and why Casso, the highest ranking official of the family out of prison, would be likely to have those records in the residence.

The language of the United States Court of Appeals for the Second Circuit in *Laaman v. United States*, 973 F.2d 107 (2d Cir.1992), is apt here. Casso, like the defendant in that case, was a fugitive. He "lived 'underground,' traveling from location to location in coordination with his equally dangerous confederates, and this itinerant, fugitive status increased the likelihood that he would carry with him evidence of any criminal activities in which he was engaged." *Id.* at 115.

■ A warrant authorizing the search for any evidence "relating to the commission of a crime" is in effect a general warrant prohibited by the Fourth Amendment because it does not tell the searching officers "for what crime the search is being undertaken." *United States v. George*, 975 F.2d 72, 75–76 (2d Cir.1992). But there is no suggestion that the agents who searched the Budd Lake residence were laboring under such a disability. They were familiar with the evidence from the trial of Vittorio Amuso. They had participated in the preparation of that case and had attended the trial. The indictment

in that case alleged the precise criminal violations recited in the warrant, except for harboring a fugitive.

The warrant authorized the search for telephone and address note books, notes, business-type records, and other documents "which contain" information concerning the identities and whereabouts of specified types of persons and the origin, receipt, concealment, or distribution of criminal proceeds relating to criminal operations involving murders, extortion, and harboring a fugitive. That seems to the court fairly specific. By reciting that the records and the criminal proceeds were the fruits or instrumentalities or evidence of the violation of the specified statutes the warrant did not broaden its scope but further articulated for the agents the extent and confines of the search.

There is justification for the government's comment that the warrant was not overbroad in listing numerous criminal statutes; it was Casso's extraordinary criminal career that triggered the applicability of those statutes.

The court holds that the warrant's language meets the particularity required by the Fourth Amendment.

But assuming it does not, the court finds that the Lenehan affidavit spelled out clearly the nature and purpose of the proposed search and the nature of the items sought. When the affidavit is considered together with the warrant, there is no doubt that the functional purposes of both—"to insure that all parties involved are informed of the scope of and limits upon the authorized search— were fully satisfied." *United States v. Bianco,* 998 F.2d 1112, 1116–17 (2d Cir.1993).

The warrant to search the Budd Lake residence was valid.

### The Warrants to Search the Casso Safe Deposit Boxes

The warrants for the search of two safe deposit boxes, one at a Brooklyn branch of Chase Manhattan Bank, rented by Casso's wife in 1980, and the other at a Brooklyn branch of Manufacturers Hanover Trust, rented by Casso's wife and daughter in June 1991, were based on an affidavit sworn to March 19, 1992 by Federal Bureau of Investigation Agent Richard Rudolph.

The affidavit states, in substance, the following. Amuso and Casso have been indicted on RICO charges for their participation as Boss and Underboss of the Luchese Family, a criminal enterprise engaged in extortion, labor racketeering, loansharking, illegal gambling, drug trafficking, and murder. Two admitted high ranking "made" members of the Luchese Family, who acknowledged their participation in crimes at the direction of Amuso and Casso, are cooperating with the government.

These two witnesses have admitted that between 1987 and September 1991 they delivered to Amuso and Casso hundreds of thousands of dollars, representing the proceeds of the illegal activities of the Luchese Family. Another witness, an admitted member of the Genovese Family, said he repaid in cash to Amuso and Casso between 1980 and 1989 about $1,000,000 as satisfaction for a pre-existing drug debt and interest.

The two Luchese witnesses also provided information that after 1987 Amuso and Casso received millions of dollars in cash from several garment center businesses controlled by the Luchese Family. These witnesses also said that Casso's position as Underboss enabled him to acquire an interest in Triple A Trucking. While Casso was a fugitive he received hundreds of thousands of dollars from Triple A in the form of checks deposited in January 1992 to the account of Casso and his wife at the Manufacturers Hanover Trust branch in which the safe deposit box is located.

The safe deposit box at the Chase Manhattan Bank has not been accessed since May 7, 1990 when Casso became a fugitive. The agent did not know when the safe deposit box at the Manufacturers Hanover Trust had last been accessed. But that bank's records show that Casso and his wife have accounts at the branch totaling about $600,000. According to one of the Luchese witnesses, Casso's wife has met with him secretly during the time he has been a fugitive.

During the years that the agent's assignment has been to investigate organized crime

he has learned that members of organized crime often keep safe deposit boxes, frequently in fictitious or other family members' names, to hoard the proceeds of their criminal activities.

█ Casso contends the affidavit was insufficient to establish probable cause because it contained mere speculation that the boxes had in them money received by Casso rather than by his wife or daughter and that the proceeds were illegally obtained.

It is hardly a secret that organized crime is organized for a purpose, namely, to make money through crime and to distribute it to the members. Common sense suggests and the affidavit confirms that the top leaders of an organized crime family are the most lavishly rewarded. Here there is no doubt that Casso amassed considerable wealth in that manner over his criminal career. He continued to direct the Luchese Crime Family even after he became a fugitive.

There is no reason to suppose that the two former high ranking Luchese Family made members, who took their lives in their hands by cooperating with the government, fabricated the statement that Casso received large sums from Luchese Family criminal activities. Indeed, it would be astonishing if he had not.

That Casso would secrete at least some of that wealth in safe deposit boxes is hardly surprising. Nor is the proposition that he would trust his wife and daughter to have that wealth in boxes in their names. Who better could remove him at least one step from discovery and yet leave him in control of his funds.

The warrant for the Casso safe deposit boxes was validly issued.

### The Warrants to Search Avellino's and Lastorino's Residences

The application for the warrants to search Avellino's and Lastorino's residences was also made by Agent Rudolph. It attaches a copy of the present indictment and copies of various documents and states in substance, the following.

Alphonse D'Arco and Peter Chiodo, formerly Captains in the Luchese Family, both now cooperating with the government, testified at several trials. D'Arco had served as the acting Boss. Both witnesses described the hierarchy of the Luchese Family and identified Vittorio Amuso as the Boss, Casso as the Underboss, and Avellino and Lastorino as Captains.

When Amuso and Casso became fugitives they created a "panel" consisting of D'Arco, Avellino, Lastorino and Anthony Baratta to oversee the business of the Luchese Family. Amuso was thereafter caught, prosecuted, and on June 15, 1992 convicted of 54 counts of racketeering, murder, extortion, and labor racketeering. D'Arco testified in the prosecution that while Amuso and Casso were in hiding Avellino and Lastorino collected money from various Luchese Family criminal operations, paid its obligations, including the legal fees for Luchese members who had been indicted, and passed on cash to D'Arco for remission to Amuso and Casso.

D'Arco testified that they demanded a strict accounting of monies received and paid, and that he therefore made records, which he sent to them, keeping copies for himself. When he decided to cooperate D'Arco turned over these copies to the Federal Bureau of Investigation.

The affidavit incorporates by reference D'Arco's testimony as to many of these records. He testified that when delivering to him cash Avellino sent records of its sources.

After Casso was caught in New Jersey on January 19, 1993, the search of his hiding place revealed $340,000 and many incriminating documents, including records of cash from the Luchese Family operations, lists of proposed members in the Luchese and Gambino Crime Families, an undated handwritten letter believed to be written by Amuso to Casso, and lists of Luchese Family "crews" and their Captains.

Among the records found was a package marked "rat," containing records in the handwriting of D'Arco. Also recovered were records recently identified by D'Arco as being in Avellino's handwriting.

These records show that, even after D'Arco's cooperation, the Luchese Family continued to conduct business as usual. Among the records were found slips of paper in Avellino's writing listing proceeds from the very same criminal operations as those which D'Arco had testified were referred to in documents received from Avellino.

The affidavit says that the Lastorino and Casso wiretaps discussed above demonstrate that both Lastorino and Avellino continued to coordinate the collection and distribution of cash and to supervise the operations of the Luchese Family. In particular the affidavit quotes from two conversations between Casso and Lastorino.

In one those conversations they discussed on January 7, 1993 money collected by "Sidney," believed to be Sidney Lieberman, the person identified by D'Arco and Chiodo as the person who handled the Luchese Family's interests in the garment center. D'Arco had testified that as of 1991, Avellino was in charge of collecting monies from Lieberman and the garment center. An excerpt from the January 7, 1993 conversation shows that business continued as usual:

> Casso: Sidney spoke to him, he said, you better give him a good envelope for Christmas.
> Lastorino: Uh Huh
>    (Simultaneous conversation)
> Casso: And then he told, the other guy told him *if you got any money owed put a list together.*
> Lastorino: Right.

(Emphasis supplied)

In a conversation of January 16, 1993, Lastorino called from his residence to Casso. They discussed many Luchese Family matters, including the collection and transfer of cash proceeds, the payment of the lawyers for Casso's co-defendants in the then pending indictment, and Casso's instructions to Lastorino to begin funneling the money from certain Luchese operations through himself to Casso rather than through Bobby Amuso, Vittorio Amuso's brother.

That January 16, 1993 conversation also refers to "Sally," believed by the agent to be Avellino. The court finds from a reading of those references that it is a fair inference that Avellino was continuing to collect from Lieberman.

Also in the January 1993 conversation, Lastorino and Casso refer to Lastorino's job to collect extortion money from Joseph Martinelli, a principal of Northberry Concrete. Amuso was convicted of the extortion of Martinelli, that crime is charged in the present indictment, and references to Martinelli payments appear in both the 1991 D'Arco and the 1993 Casso records.

D'Arco and Chiodo also testified that Avellino was in charge of the Luchese Family's interests in the carting industry. On December 31, 1992, Judge I. Leo Glasser in a civil RICO case barred Avellino from that industry. Judge Glasser ordered him to, among other things, refrain from participating directly or indirectly in the industry, divest himself of his interests in it, disgorge the illicit proceeds of his racketeering activity, and refrain from associating with known members and associates of organized crime for any commercial purposes. The judge also ordered audits of Avellino's books and records at his offices.

Since the decree Avellino had not been observed going to the offices of carting businesses under his control but had been observed coming and going to his residence.

Frank Lastorino has never been observed working from any office, but has been observed coming and going from his residence.

Avellino makes two arguments for suppressing the evidence seized from his residence. He says that crucial information in the warrant application was stale and that in any event there was no probable cause to believe the evidence sought would be at his residence.

His contention as to staleness assumes that the only evidence to support the allegation he was recently involved in collecting and disbursing funds is the information supplied in 1991 by D'Arco. But the records found in Casso's possession in January 1993 show Avellino's role as collector and disburser. While the records are not dated as to year, they refer to the months of March

through October. It is reasonable to infer that Casso would maintain records of more recent vintage rather than older ones whose usefulness had diminished with time.

Avellino also says that the January 16, 1993 conversation between Casso and Lastorino provides no basis for a claim the "Sally" referred to is Avellino. That contention ignores the history of Avellino's activities to which D'Arco testified. There is no suggestion that another "Sally" was engaged in those activities.

Avellino also quotes additional excerpts from the January 16, 1993 conversation to support his contention that "Sally" was not handling any money. Those excerpts appear to refer solely to the disbursement of funds for lawyers representing the Luchese interests. Casso says: "We don't need Sally to do that. Cause Sally makes himself strong with the lawyers." These excerpts plainly do not cast doubt on, for example, that part of the conversation in which Casso refers to "starting January" with "Sidney's [Lieberman's] money and with Sally and with what everybody sends in."

The court is satisfied that the affidavit showed probable cause to believe Avellino and Lastorino continued to keep records of the activities of the Luchese Family. If they did so, it is fair to infer that they would keep those records in their residences. Even before Avellino was barred from the carting industry, it seems unlikely that he would have maintained such records in one of those offices, where he might not be assured of complete security. After Judge Glasser directed audits at Avellino's offices, it seems certain that records of Luchese operations would not be there. Avellino's residence gave him security and was the logical place where records might be found.

The same can be said of Lastorino's residence. He was doing business from there and called Casso from there. He had no office or other likely place to conceal records or cash.

The court finds there was probable cause for the search of the residences of Avellino and Lastorino.

*The Request for a Bill of Particulars*

In response to Avellino's request for a bill of particulars the government has supplied additional information along with its memorandum of law dated October 12, 1993. The indictment and other information provided to defendants enable them to identify the charges, prepare for trial, and interpose a plea of double jeopardy should they be prosecuted a second time for the same offense. *United States v. Davidoff,* 845 F.2d 1151, 1154 (2d Cir.1988).

*Conclusion*

The court denies defendants' motions except that of Avellino with respect to the Jaguar tapes, as to which the court will hold a hearing. So ordered.