T.C. Memo. 2016-118

UNITED STATES TAX COURT

JOHN FINNEGAN AND JOAN FINNEGAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8637-13.                                    Filed June 16, 2016.

<u>Jared J. Scharf</u>, for petitioners.

<u>Michael J. De Matos</u>, <u>Rose E. Gole</u>, and <u>Gennady Zilberman</u>, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  On February 7, 2013, respondent issued petitioners a

notice of deficiency determining deficiencies and section 6662(a)[1] accuracy-

---

[1]Unless otherwise indicated, section references are to the Internal Revenue
Code of 1986, as amended and as in effect for the years in issue, and Rule
references are to the Tax Court Rule of Practice and Procedure.

[*2] related penalties for the taxable years 1994 through 2001. Petitioners contend that the assessments are time barred by the three-year period of limitations of section 6501(a). Relying on Allen v. Commissioner, 128 T.C. 37 (2007), respondent counters that the limitations period remains open under section 6501(c)(1) because petitioners' return preparer, Duane Howell, prepared each return falsely or fraudulently with the intent to evade tax. Accordingly, we must decide whether respondent has proved clearly and convincingly that petitioners' returns were prepared falsely or fraudulently with the intent to evade tax.

Preliminary Matters

Petitioners have objected to the admission into evidence of certain testimony and documents. On the grounds of relevancy, petitioners object to the testimony of Internal Revenue Service Special Agent Ashcroft and of Glen Robins, Mr. Howell's former associate.[2] Respondent asserts that the testimony is evidence of Mr. Howell's modus operandi and thus relevant to the question of fraudulent intent.

---

[2]Despite the Court's instructions at trial, petitioners did not brief the evidentiary matters in a separate evidentiary section of their opening brief. Petitioners did, however, include a footnote to "avoid a waiver" of their argument. The footnote discusses hearsay objections, but not relevancy. We nevertheless address petitioners' relevancy objections discussed in their responding brief.

**[*3]**   Trials before the Tax Court are conducted in accordance with the Federal Rules of Evidence, Rule 143(a),[3] which provide the general rule that all relevant evidence is admissible, Fed. R. Evid. 402.  Relevant evidence is evidence having "any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Respondent offered Mr. Robins' and Special Agent Ashcroft's testimony to prove that when Mr. Howell prepared fraudulent returns, he routinely used certain entries and methods which also appear on petitioners' returns. Petitioners' reasoning for why the testimony is not relevant, that Mr. Robins did not prepare petitioners' returns and Special Agent Ashcroft did not investigate petitioners' returns, is misplaced.  "Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice."  Fed. R. Evid. 406.  We find the testimony of Mr. Robins and Special Agent Ashcroft relevant.  Whether Mr. Howell had a habit or routine when fraudulently preparing returns and whether petitioners' returns display elements of

---

[3]The rule in effect during trial in the instant case reads:  "[T]rials before the Court will be conducted in accordance with the rules of evidence applicable in trials without a jury in the United States District Court for the District of Columbia".  The District Court's local rules do not include any provision affecting the applicability of Federal Rules of Evidence cited in the instant opinion.

**[*4]** that habit or routine are facts of consequence making it more or less probable that Mr. Howell prepared petitioners' returns falsely or fraudulently with the intent to evade tax. Furthermore, the testimony is not needlessly cumulative because Mr. Robins and Special Agent Ashcroft testified as to different aspects of Mr. Howell's methods of fraud.

On the grounds of relevancy and hearsay, petitioners also objected to the admission of Mr. Howell's affidavit and previous testimony in the criminal trial of Timothy Mitts, Mr. Howell's former employee. As in the case of the testimony discussed above, petitioners' relevancy objection is misplaced. Mr. Howell's statements are relevant in determining his motive and intent when making certain entries in petitioners' returns. We also determine that these documents are not inadmissible hearsay. Hearsay is admissible as specified by a Federal statute, as prescribed by the Supreme Court, or as provided in the Federal Rules of Evidence. Fed. R. Evid. 802. There is no dispute that Mr. Howell's affidavit and his prior testimony are hearsay, but respondent contends that these documents are admissible pursuant to rule 804(b)(3) of the Federal Rules of Evidence. Under this exception, hearsay is admissible if: (1) the declarant of the statement is unavailable; (2) the statement, when made, was "so contrary to the declarant's proprietary or pecuniary interest" that it would only have been made by a

**[*5]** reasonable person if the person believed it to be true; and (3) the statement "is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."  Fed. R. Evid. 804(b)(3).

In the instant case we find that the first requirement is met because Mr. Howell was unavailable.  Fed. R. Evid. 804(a)(5).  The Court may rely on counsel's representations as to the witness' availability.  See, e.g., Haeri v. Commissioner, T.C. Memo. 1989-20.  Respondent's counsel represents that efforts to procure Mr. Howell's attendance began eight months before trial and included calls to Mr. Howell, his then representative, notices via certified mail, and 10 separate attempts made by revenue agents and a private process server to serve Mr. Howell with a subpoena.  Petitioners contend that respondent should have leveraged Mr. Howell's plea bargain with the United States in his criminal case to compel him to testify.  The test, however, is not whether respondent used all means at his disposal to procure a witness, but rather whether he used reasonable means. Because respondent was unable to procure Mr. Howell's attendance or testimony despite process and other reasonable means, we determine Mr. Howell was unavailable at trial.

**[\*6]** The second requirement is met because Mr. Howell's statements expose him to criminal liability and civil liability from former clients. See United States v. Scopo, 861 F.2d 339, 348 (2d Cir. 1988); United States v. Chan, 184 F. Supp. 2d 337, 342 (S.D.N.Y. 2002). At least one client has already instigated legal proceedings against Mr. Howell, using his statements at the Mitts trial. See, e.g., Moore v. Howell, docket No. 2541-10 (N.J. Super. Ct. May 1, 2015). The fact that Mr. Howell testified pursuant to a plea agreement does not render his statements unreliable or inadmissible. See Scopo, 861 F.2d at 348. Finally, Mr. Howell's statements are corroborated by petitioners' testimony regarding his role in the preparation of the returns, Mr. Robins' testimony regarding office routines, and Special Agent Ashcroft's testimony about Mr. Howell's modus operandi.

Accordingly, we admit into evidence: Exhibit 57, the transcript of Mr. Howell's testimony in the Mitts trial; Exhibit 63, Mr. Howell's affidavit stating that he fraudulently prepared petitioners' returns; and the testimony of Special Agent Ashcroft and Mr. Robins.[4]

---

[4]Petitioners additionally object to the introduction into evidence of a myriad of other documents. We sustain petitioners' objections, as we did not rely on those documents in making our determinations and they have no bearing on our decision.

**[*7]**                                    FINDINGS OF FACT

I.     Petitioners

Some facts have been stipulated and are so found.  The parties' stipulations are incorporated in this opinion by reference and are found accordingly.  During taxable years 1994 through 2001, petitioners John and Joan Finnegan resided in Monsey, New York.  In 2003 petitioners moved from New York to Florida.  At the time of the filing of the petition, petitioners resided in Ormond Beach, Florida.

During the years in issue petitioner Joan Finnegan was a full-time employee of Rockland County Community College and petitioner John Finnegan was employed as a plumber for several New York City contracting firms. Petitioners owned their home in Monsey, New York, and a rental property in Daytona Beach, Florida, which they had purchased in 1988 for approximately $60,000 (condo). Petitioners did not visit the condo during the first 10 years of ownership.  To rent the condo, petitioners exclusively used the services of an independent business, Condo Rentals of Daytona.  Petitioners were not affiliated with Condo Rentals of Daytona except as customers.  Condo Rentals of Daytona handled the procurement and screening of renters, credit report screening, and drafting of contracts. Petitioners' annual cost for management services for the condo remained below $11,600.

[*8] After their original accountant moved away, petitioners hired Mr. Howell to prepare their returns. Mr. Howell advised petitioners that they should form a partnership to report their rental activity. Mr. Howell incorrectly explained that forming the partnership would allow petitioners to contribute moneys they received from the condo rentals to a Keogh/self-employment retirement plan account. With Mr. Howell's help, petitioners formed a partnership named "Jomarjen", which appears in every Schedule E, Supplemental Income and Loss, of petitioners' Forms 1040, U.S. Individual Income Tax Return, for the years in issue.

Petitioners did not draft a partnership agreement for Jomarjen, and the filing address for the partnership return changed from year to year. Other than creating Jomarjen, petitioners did not change anything concerning the operation of their rental investment. Condo Rentals of Daytona continued to manage the renting of the condo and made payments of the rental revenues to petitioner Joan Finnegan, issuing her Forms 1099-MISC, Miscellaneous Income, rather than to Jomarjen. If, for any reason, petitioners communicated directly with their tenants, they did so individually, and not as Jomarjen. Petitioners never transferred title of the condo to Jomarjen. Petitioners never wrote checks to Jomarjen, and Jomarjen never wrote

[*9] checks to petitioners. Petitioners did not have a separate office for their condo rental activity.

During the years after forming Jomarjen, petitioners did contribute moneys to a retirement account. Petitioner Joan Finnegan testified that she could not recall how much they contributed from year to year.[5] Mr. Howell mailed letters instructing petitioners how much they should contribute, but some years petitioners did not contribute these amounts. Petitioner Joan Finnegan could not recall whether Mr. Howell's number appeared on the tax return despite petitioners' failure to contribute.

Petitioners' Forms 1040, Schedules E for tax years 1997, 1998, 1999, 2000, and 2001 show Gannan Co. in addition to Jomarjen. Gannan Co.'s partnership returns report petitioners as the sole partnership owners. At trial petitioners testified that they did not know what Gannan Co. was, that they learned the name only after the examination of their returns, and that it does not exist. Petitioners also testified that after following Mr. Howell's advice, their tax returns became very thick and they received larger refunds than in years past.

---

[5]Although petitioners were able to provide to the Internal Revenue Service documents from their financial planner related to the account, these documents were not introduced at trial.

**[\*10]** II.     Returns

The relevant returns in issue are petitioners' Forms 1040 and the Forms 1065, U.S. Return of Partnership Income, for Jomarjen and Gannan Co. filed for tax years 1994 through 2001.  The returns include several figures which repeat across returns and across years, with mostly vague descriptions.  The figure $312, for example, appears in petitioners' 2001 Form 1040, in all Jomarjen Forms 1065 except for tax year 1996, and every Gannon Co. Form 1065.  The figure $364 appears in petitioners' 1994 Form 1040, all Jomarjen Forms 1065 except for tax year 2001, and every Gannan Co. Form 1065.  The figure $499 appears in every relevant return except for those filed for 1994.  The figure $572 appears in every relevant Form 1065, as well as petitioners' Form 1040 for tax years 1995 and 2001.  These figures are described on the returns with vague terms such as "miscellaneous", "other expenses", "other income", "cash contributions", "supplies", "purchases", and more.  The figure $4,896 appears in every partnership return, except for Jomarjen's 2001 Form 1065, as "office supplies or expenses".  Finally, for every Form 1040, petitioners showed net income of $2 on Schedule C, Profit or Loss From Business.

The partnerships' returns are related to petitioners' returns and show significant losses.  As previously mentioned, Jomarjen appears on petitioners'

[*11] Forms 1040, Schedule E, for 1994 through 2001, and Gannan Co. appears for 1997 through 2001. The partnerships' returns filed for those years report petitioners as 100% owners in the aggregate. Through the years, petitioners reported losses in excess of $300,000 related to Jomarjen and Gannan Co. There are also several transfers to Jomarjen noted on petitioners' Schedules C. Jomarjen reported gross income in excess of the amounts petitioners received from the condo rentals, and for tax year 1999, for example, greatly in excess of the amount shown on the Form 1099-MISC issued by Condo Rentals of Daytona.

There are connections between the partnerships as well. During 1999 Jomarjen issued to Gannan Co. Forms 1099-MISC reporting nonemployee compensation of $24,400. Also, Gannan Co. issued a Form 1099-MISC to John Finnegan reporting nonemployee compensation of $86,000. John Finnegan did not recall receiving $86,000 from any partnership.

Petitioners' returns do not list Mr. Howell as the preparer. Instead, the preparer changes from year to year, along with the post office box address for the return preparer. Petitioners are not familiar with the preparer entities on the preparer lines of the returns.

**[\*12]** III.    <u>Preparation of Petitioners' Returns</u>

For the tax years in issue Mr. Howell directly prepared or supervised the preparation of petitioners', Jomarjen's, and Gannan Co.'s returns. Generally, Mr. Howell or one of his associates provided petitioners with a tax organizer for the year. Petitioners completed the organizer and returned it to Mr. Howell. Petitioners did not review their individual income tax returns or the partnership returns for Jomarjen and Gannan Co. after Mr. Howell prepared them. Although petitioners followed Mr. Howell's instructions and saved receipts and proof of expenses they incurred, petitioners disposed of those receipts and records when they moved to Florida in 2003.

IV.    <u>Duane Howell</u>

During 1992 through 2003 Mr. Howell prepared approximately 750 to 800 tax returns per year, including individual income tax returns, partnership income tax returns, and information returns. Mr. Howell began his return preparation process as many accountants do, by providing his clients with "tax organizers" in which clients listed their financial and accounting information. He testified at the <u>Mitts</u> trial, however, that every return he prepared included at least some fraudulent entries.

[*13] One common fraudulent scheme began with Mr. Howell's urging certain clients to set up partnerships. For those with income activities separate from their salaries, such as rental property owners, the partnerships served to report purported income from the separate activities. Mr. Howell also set up false partnerships that were not connected with any existing businesses or activities. Mr. Howell believed partnerships were less vulnerable to audits than sole proprietorships reported on Forms 1040, Schedule C, and so he placed false income and expenses on partnership returns and used the partnership form to avoid scrutiny from the Internal Revenue Service. The false expense deductions that Mr. Howell placed on the partnership returns created large losses that flowed through to the clients' individual income tax returns, thereby lowering their income tax liabilities. Mr. Howell prepared Forms 1099-MISC and Forms 1096, Annual Summary and Transmittal of U.S. Information Returns, that maintained the appearance of legitimate partnerships, and reported purported payments made by the partnerships to related partnerships or partners.

Another scheme consisted of Mr. Howell's promoting Keogh/self-employment retirement plans to individuals who had wages and other income. Mr. Howell used the term "constructive receipt" to describe income reported on his clients' returns that actually was not received. Mr. Howell falsified income from

[*14] partnerships and payments made by the partnerships in order for his clients to claim Keogh/self-employment retirement plan deductions and lower their tax liabilities. Mr. Howell instructed his clients as to the amounts they should contribute for the year, but he did not verify whether the contributions were actually made.

Mr. Howell did not prepare returns using his own name but rather used multiple entity names as the purported tax return preparer, including Jon Lea, Inc., Don Step, Inc., DPH HowCo, Johnson Units, Inc., John Unit, Inc., Comsulco, and Comsulco Financial Services Group. Mr. Howell decided which preparer entity name would be used on each return. Mr. Howell controlled various post office box addresses which he placed on the preparer address lines on his clients' returns and which he changed from year to year. Because the partnerships' addresses were also sometimes changed, the Internal Revenue Service Centers where the returns were filed changed from year to year. Mr. Howell tried to ensure that the venue where partnership returns were filed differed from the venue where his clients' Forms 1040 were filed.

V.    Criminal Investigation and Prosecution

Before he even began preparing petitioners' returns, Mr. Howell had been investigated for and convicted of preparing false returns during the 1980s. As a

[*15] result of his conviction, Mr. Howell lost his certified public accountant's (C.P.A.) license. Several years later, the Internal Revenue Service's Criminal Investigation Division (CID) once again investigated Mr. Howell, this time regarding his preparation of tax returns for the years 1992 through 2003.

Because of his preparation and submission of fraudulent returns during 1992 to 2003, Mr. Howell was indicted in the U.S. District Court for the Southern District of New York in 2006 for conspiring to commit an offense or to defraud the United States, 18 U.S.C. sec. 371, and attempting to interfere with the administration of internal revenue laws, sec. 7212(a); 18 U.S.C. sec. 2. Pursuant to a plea agreement signed March 14, 2007, Mr. Howell pleaded guilty to both counts of the indictment.

CID Special Agents Robert Miranda and Steven Ashcroft were assigned primary responsibility for the later CID investigation of Mr. Howell and Mr. Robins. During the investigation, the special agents ordered and examined the original individual income tax returns and the related partnership returns of Mr. Howell's clients, as well as transcripts from the Internal Revenue Service's Integrated Data Retrieval System. The special agents were able to identify common characteristics on returns prepared by Mr. Howell, including: (a) large refunds and partnership losses; (b) purported payments between partnerships and

[*16] their respective partners; (c) the filing of partnership returns with different Internal Revenue Service Centers from year to year; (d) partnerships whose addresses changed every year; and (e) the issuance of Forms 1099-MISC to partners or other partnerships.

Other common characteristics of returns prepared fraudulently by Mr. Howell included repeating numbers, such as expenses of $312, $364, $499, $572, $4,896, all of which were created by Mr. Howell and not supplied by his clients, income on Schedules C that netted to exactly $2, deductions for Keogh/self-employment retirement plans, along with guaranteed payments based upon a client's desired retirement plan contribution or deduction, and purported transfers between Schedules C and related partnerships that were reported as expenses.

VI.    Petitioners' Returns and the Investigation

As part of the investigation, CID reviewed petitioners' returns. Petitioners' returns, however, did not form part of the indictment. Special Agent Ashcroft testified that petitioners were not selected as grand jury witnesses for the prosecution of Mr. Howell and Mr. Robins because they were not properly interviewed by CID and there were already a sufficient number of client witnesses.

On February 7, 2013, respondent issued to petitioners a notice of deficiency for the taxable years 1994 through 2001, determining deficiencies and section

[*17] 6662(a) accuracy-related penalties.  In those notices, respondent disallowed the  following:  (1) petitioners' Schedule E partnership loss deductions; (2) petitioners' Schedule C deductions in their entirety; and (3) petitioners' deductions for Keogh/ self-employment retirement plans.  Respondent contends that these entries are false or fraudulent although they are due to Mr. Howell and not to petitioners' actions.  On April 19, 2013, petitioners timely filed a petition with this Court.

OPINION

We must decide whether respondent has proved that petitioners' returns were prepared falsely or fraudulently with the intent to evade tax.

I.    Limitations Period

We begin with an analysis of the limitations period for assessment of income tax.  The Commissioner generally must assess any income tax within the three-year period after a taxpayer files his or her return.  Sec. 6501(a).  In the case of a false or fraudulent return with the intent to evade tax, however, tax determined to be due may be assessed at any time.  Sec. 6501(c)(1).  In Allen v. Commissioner, 128 T.C. at 42, we held that section 6501(c)(1) applies even if it is the preparer of the return, and not the taxpayer, who falsely or fraudulently

**[\*18]** prepared the return with the intent to evade tax.  But see BASR P'ship v.

United States, 113 Fed. Cl. 181 (2013), aff'd, 795 F.3d 1338 Fed. Cir. (2015).[6]

## II.  False or Fraudulent Returns

Fraud is the intentional commission of an act or acts for the specific purpose

of evading tax believed to be due and owing.  Petzoldt v. Commissioner, 92 T.C.

661, 698 (1989).  The definition of fraud for purposes of section 6501(c)(1) is the

same as the definition of fraud for purposes of the section 6663 fraud penalty.

Rhone-Poulenc Surfactants & Specialties v. Commissioner, 114 T.C. 533, 548

(2000).  Accordingly, respondent must prove for each return in issue that (1) an

underpayment of tax exists and (2) that the intention was to evade taxes known to

be owing by conduct intended to conceal, mislead, or otherwise prevent the

collection of tax.  See Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).

---

[6]We see no reason to revisit Allen v. Commissioner, 128 T.C. 37 (2007), on account of BASR P'ship v. United States, 113 Fed. Cl. 181 (2013), aff'd, 795 F.3d 1338 (Fed. Cir. 2015).  In the Court of Appeals for the Federal Circuit's opinion, a persuasive dissent was filed, as well as a concurring opinion that relied on sec. 6229, a provision inapplicable in the instant case.  Accordingly, even in cases appealable in the Federal Circuit, it is unclear whether, in the absence of the application of sec. 6229, which interpretation of sec. 6501(c)(1) would prevail.  Moreover, there is no jurisdiction for appeal of any decision of the Tax Court to the Court of Appeals for the Federal Circuit.  Sec. 7482(a)(1).  Additionally, the parties have not cited BASR P'ship and do not contend we should revisit Allen.  Thus, Allen is controlling precedent in the instant case, and we do not revisit the analysis and conclusion in that Opinion.

**[\*19]** Because respondent alleges that Mr. Howell, not petitioners, acted fraudulently, we must decide whether respondent has proved clearly and convincingly that Mr. Howell placed the false entries on petitioners' returns with the intent to evade tax. "Fraud may not be imputed or presumed but must always be established by independent evidence of fraudulent intent to evade tax". Eriksen v. Commissioner, T.C. Memo. 2012-194, 2012 WL 2865875, at \*8. Negligence, either general or gross, is not synonymous with fraud because fraud requires scienter. Webb v. Commissioner, 394 F.2d 366, 377-378 (5th Cir. 1968), aff'g T.C. Memo. 1966-81; Bruce Goldberg, Inc. v. Commissioner, T.C. Memo. 1989-582. The existence of fraud is a factual determination to be gleaned from the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), aff'd, 578 F.2d 1383 (8th Cir. 1978).

Mr. Howell's affidavit states that he prepared, for the tax years in issue, false income tax returns for petitioners and their partnerships. Mr. Howell did not testify, however, so there are no details or examples identifying the false entries. This is not an insurmountable burden for respondent. Fraudulent intent is rarely shown by direct evidence. Courts have distilled fraudulent intent by viewing circumstantial evidence in the light of certain indicia of fraud. Some factors that are frequently evaluated in deciding whether fraudulent intent exists are:

**[\*20]** understatements of tax, inadequate books and records, implausible or inconsistent explanations of behavior, and making false entries or alterations. See Spies v. United States, 317 U.S. 492, 499 (1943) (criminal tax evasion); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Solomon v. Commissioner, 732 F.2d 1459, 1461-1462 (6th Cir. 1984), aff'g T.C. Memo. 1982-603. We must therefore consider the conduct in the instant case while being mindful of the factors detailed above and decide whether the evidence is "so strong" that fraud is the most manifest explanation. Biggs v. Commissioner, 440 F.2d 1, 5 (6th Cir. 1971), aff'g T.C. Memo. 1968-240; see also Richardson v. Commissioner, 509 F.3d 736, 743-745 (6th Cir. 2007), aff'g T.C. Memo. 2006-69.

The Commissioner is required to prove fraud by "clear and convincing evidence." Sec. 7454(a); Rule 142(b). Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not the extent of such certainty as is required beyond a reasonable doubt as in criminal cases." Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 516 (1990); Eriksen v. Commissioner, 2012 WL 2865875, at \*8.

[*21] Accordingly, we must decide whether respondent has shown with clear and convincing evidence that petitioners' returns include false entries due to Mr. Howell's bad faith, intentional wrongdoing, or sinister motive and that they resulted in an underpayment of tax.

III.    Petitioners' Returns

A.    Underpayment of Tax

Petitioners stipulated that they will concede the determined deficiencies if we conclude that the period of limitations is open under section 6501(c)(1). The stipulations are binding on the parties by virtue of Rule 91(e) and prove by clear and convincing evidence that an underpayment of tax exists in the instant case with respect to each year in issue. See Eriksen v. Commissioner, 2012 WL 2865875, at *9. Accordingly, it is irrelevant that respondent did not check with vendors or review petitioners' credit card purchases or checking accounts to determine whether petitioners incurred the expenses deducted. The determination does not result from a failure of proof, but from the parties' stipulations that petitioners are liable for the deficiencies if the periods of limitations are open under section 6501(c)(1).

Additionally, respondent has provided evidence showing the returns include erroneous entries resulting in underpayments of tax. Contrary to petitioners'

[*22] contention, respondent is not simply relying on petitioners' lack of recollection and confusion about their business as his sole evidence. Petitioners testified that they had no relationship to Gannan Co. even though the partnership appears on their Schedules E from 1997-2001. Petitioners also testified that Condo Rentals of Daytona continued to manage all of the rental duties, yet Jomarjen reported annual gross receipts and expenses that were vastly higher than payments made to petitioners, the roughly $12,000 it cost to manage the condo, and in 1999, for example, than amounts shown on the Form 1099-MISC issued to Joan Finnegan.

### B. Elements of Fraud: Intent

Respondent submits that Mr. Howell prepared petitioners' tax returns fraudulently by claiming fabricated partnership losses, Schedule C expenses, and retirement contribution deductions. To carry his burden, respondent compares petitioners' returns to Mr. Howell's modus operandi in cases in which he admitted to preparing fraudulent returns. Respondent infers from the similarities, as well as the trial testimony, that Mr. Howell prepared each return in issue with the intent to evade tax.

Petitioners' returns display many of the characteristics of the returns which Mr. Howell admitted to preparing fraudulently. Petitioners testified that they were

[*23] unfamiliar with the Gannan Co. partnership and that they had never owned or operated any business or profit-seeking venture titled Gannan Co. Yet the partnership is listed on petitioners' Schedules E and Forms 1099-MISC, one of which shows Gannan Co. distributing thousands of dollars to John Finnegan that he did not recall receiving. Petitioners contend that Mr. Howell may have made a mistake and that the partnership belonged to another client. We find such an inference implausible. Mr. Howell testified that one of his methods for producing fraudulent returns involved fabricating partnerships with fabricated guaranteed payments, which would then justify deducting retirement contributions that his clients did not, in fact, ever make. The repeated appearance of Gannan Co. on petitioners' returns and documents, along with Mr. Howell's testimony, clearly indicates to us that the Gannan entries on petitioners' returns were made fraudulently with the intent to evade tax.

Petitioners contend that the fact that petitioners' individual and partnership returns were "consistent with" other fraudulent returns prepared by Mr. Howell is subjective and not probative. Respondent, however, provides specific elements of petitioners' returns that match Mr. Howell's modus operandi. Such elements include: (1) Schedule C income of $2 (the balance being transferred over to a partnership), (2) two new partnerships that petitioners did not form until engaging

[*24] Mr. Howell's services, (3) an entire partnership with which petitioners were unfamiliar, (4) repeating entries of certain figures that Mr. Howell testified he routinely used when fabricating returns, (5) large partnership losses, and (6) deductions for Keogh/self-employed retirement accounts when petitioners earned wages.

Petitioners contend that respondent failed to offer evidence that the repeating figures are false or fraudulent, and that because repetition is not by itself proof of fraud, their existence is not probative. On the contrary, Mr. Howell testified that $4,896, for example, was a figure he routinely entered for office expense deductions by estimating $100 spent per week, even when taxpayers did not incur any office expenses. Petitioners testified that they rarely communicated with their tenants and claimed no home office. Also, the figures' frequency and repetition is, by itself, additional evidence that they are not based on receipts or information provided by petitioners. We believe such figures would fluctuate annually if they were actually incurred.

Petitioners' returns also include elements to avoid detection. Such elements by themselves would be relevant, and they are even more so in the instant case because Mr. Howell testified that they were part of his modus operandi. The addresses for petitioners' partnerships changed over the years, often differing from

[*25] the jurisdictions where petitioners filed their individual Forms 1040. Special Agent Ashcroft testified that mailing tax returns to different Service Centers could delay any cross-year or cross-return comparisons and does delay obtaining original returns during an examination.

Petitioners' returns also show, from year to year, different return preparers with different addresses. Petitioners contend this merely shows that Mr. Howell was trying to conceal his identity because his C.P.A. license had been revoked and that the concealment evidence therefore lacks any probative value. We do not agree. Mr. Howell's attempting to avoid detection is probative. The fact that the addresses, and not only the names, changed from year to year is further evidence that respondent's inference is the correct one to draw.

Comparing the instant case to Eriksen v. Commissioner, 2012 WL 2865875, is instructive. Eriksen involved six taxpayers whose return preparer was convicted of preparing false and fraudulent returns with the intent to evade tax. In Eriksen, the taxpayers' returns were not included among the 51 returns considered as part of the preparer's guilty plea. Id. at *4. Although the preparer testified in Eriksen, he was unable to recall at trial preparing any of the returns there in issue. Id. at *2. The Court held for five of the taxpayers but against the sixth. The key distinction of the sixth taxpayer, although she had not committed fraud herself, was her

[*26] testimony that her return included deductions for expenses she had not in fact incurred. Id. at *12. The Commissioner then established that the expenses were of the type the preparer had pleaded guilty to fabricating. Id. Viewing these facts in conjunction with other badges of fraud, the Court determined that the sixth taxpayer's returns were false or fraudulent. Id.

Petitioners contend that Eriksen stands for the proposition that, to establish fraud, the Commissioner must prove a "direct link" between the commission of fraud and a taxpayer's return. Petitioners strongly imply that the only way to establish such a direct link is through the preparer's testimony. In Eriksen, the Commissioner established the existence of fraud by matching the incorrect information on the taxpayer's return to the preparer's modus operandi. In other words, even taking petitioners' contention into account, there are ways of providing an evidentiary link that do not involve a preparer's specific testimony as to a particular taxpayer.

Petitioners also contend that their circumstances are similar to those of the first five Eriksen taxpayers because, without a connection or direct link between Mr. Howell's wrongdoing and petitioners or their partnerships, respondent's evidence rises only to the level of "a suspicion of fraud". We do not agree. We

[*27] think that petitioners' circumstances are most similar to those of the sixth Eriksen taxpayer. Respondent has already shown that petitioners' returns include significant errors, namely, Jomarjen's gross income above and beyond the revenues collected by Condo Rentals of Daytona and the Gannan Co. partnership's entries on petitioners' returns. Respondent provided additional testimony that identified specific figures in petitioners' returns, e.g., $4,896, which were frequent fabrications of Howell's. Additionally, the preparer in Eriksen testified in his plea allocution that not all returns he prepared were fraudulent. Id. at *4. Mr. Howell testified that every return he prepared included at least some fraudulent entries, and because of these false entries, was "dirty".

Respondent having produced sufficient evidence to establish that a portion of each of petitioners' underpayments is attributable to fraud, we conclude the periods of limitations for those years remain open pursuant to section 6501(c)(1).[7] See Allen v. Commissioner, 128 T.C. at 42; Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner, 114 T.C. at 548. Because we hold that the period of limitations is open on account of the false and fraudulent nature of each

---

[7]We reach this conclusion without drawing any inference from petitioners' lack of books and records for the years in issue. Petitioners testified credibly that, when they moved from New York to Florida in 2003, they disposed of all the receipts and other records and retained only the tax returns.

[*28] of petitioners' Federal income tax returns for 1994 through 2001, petitioners concede the deficiency respondent determined for each of those years. Accordingly, we hold that there are deficiencies in petitioners' Federal income tax for 1994 through 2001 of $32,697, $3,024, $7,940, $15,853, $18,641, $15,217, $16,720, and $13,909, respectively.

IV.     Penalties

Respondent also determined that petitioners are liable for accuracy-related penalties. See sec. 6662(a). Pursuant to section 7491(c),[8] respondent bears the burden of production with respect to petitioners' liability for section 6662(a) penalties. This means that respondent "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty". Higbee v. Commissioner, 116 T .C. 438, 446 (2001).

For purposes of section 6662, the term "negligence" includes any failure to make a reasonable attempt to comply with the income tax provisions of the Code. Sec. 6662(c). This includes failing to make "a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a

---

[8]Sec. 7491(c) is effective for examinations commencing after July 22, 1998. It is unclear from the record when the examination of petitioners' returns began. In the interest of thoroughness, we assume it began after petitioners' filing of their 2001 Form 1040.

[*29] reasonable prudent person to be 'too good to be true' under the circumstances". Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. Taxpayers should be able to show, at a minimum, that they fulfilled a duty of inquiry with regard to whether their return properly reported their tax liability. Eriksen v. Commissioner, 2012 WL 2865875.

Petitioners testified that they signed and filed the returns Mr. Howell prepared for them without reading them. We do not doubt this testimony, as petitioners filed returns for an entire partnership, which was also reflected on their personal return, without noticing that it was wholly unrelated to their affairs. Petitioners were unfamiliar with even the most basic line items on the returns, such as their professions, addresses, and total income. Respondent has shown that petitioners failed to fulfill their duty of inquiry. See id. Petitioners' failure to review the returns is especially reckless considering that the sizes of their returns and refunds grew significantly when they became clients of Mr. Howell. These were signals that Mr. Howell's changes may have been "too good to be true" and petitioners should have made reasonable attempts to ascertain the correctness of the new deductions. See sec. 1.6662-3(b)(1)(ii), Income Tax Regs. Petitioners, in fact, recognize that a lack of review can give rise to an inference of negligence, and are silent as to any defense against the penalties. Consequently, we conclude

**[*30]** that respondent has met his burden of production for determining accuracy-related penalties due to negligence or disregard of rules or regulations.

In reaching our decision, we have considered all arguments made, and to the extent that we have not specifically addressed them, we conclude they are moot, irrelevant, or without merit.

To give effect to the foregoing,

Decision will be entered for

respondent.